## KENDRICK v. HEALY

(No. 949; Decided October 5, 1920; 192 Pac. 601; See also
26 Wyo. 261; 183 Pac. 37)

Animals—Willful Trespass—Herding Sheep in Another's Field is Willful Trespass—A License May be Created by Parol or Implied From Conduct—A License May be Implied From Failure to Object to Acts Repeatedly Done on Land—Evidence—Trial—Court Admonition to Witness—Instructions on Trespass—Damages for Trespass.

1. In an action for damages caused by sheep destroying plaintiff's hay, where the petition charged that the sheep were intentionally driven upon the hay and intentionally permitted to eat it, plaintiff could recover only on proof of a willful trespass.

2. In an action for damages caused by sheep in eating, trampling down and destroying plaintiff's hay, evidence held to prove a willful trespass.

3. Owners of sheep driven or intentionally permitted by a herder to go upon and destroy hay belonging to another are liable to him for damages unless he is so far without right in the premises as to justify a willful appropriation.

4. Where a purchaser of hay was permitted to leave it on the premises for a reasonable time, sheep owners who subsequently purchased a lease, though entitled to the exclusive possession of the premises, were not entitled to intentionally permit sheep to eat and destroy such

hay, though at such time the purchaser of the hay had no rights on the premises.

5.   Where a purchaser of hay was permitted to leave the hay stacked on land for a reasonable time, and the land was thereafter sold to one who consented that the hay might remain on the land, to which arrangement a lessee and lessee's assignee made no objections, the hay was upon the premises rightfully by license while the premises were in possession of such assignee, so as to entitle the purchaser of the hay to recover for the willful destruction thereof by the assignee's sheep.

6.   A license may be created by parol as well as in writing, and may be implied from the acts of the parties, from their relations, and from usage and custom.

7.   When the owner of land, with full knowledge of the facts, tacitly permits another repeatedly to do acts upon the land, a license to do such acts may be implied from owner's failure to object.

8.   In an action for damage caused by defendant's sheep eating and destroying plaintiff's hay stacked on land occupied by defendants as lessees, testimony that lessor had permitted hay to remain on the land held admissable as against objection that the lease was the best evidence and contained no such reservation, such testimony being competent to prove license by lessee's predecessors, and the subsequent consent of the lessee recognizing and continuing such license.

9.   In an action for damages involving the issue whether defendant's sheep had been driven or intentionally permitted to go upon plaintiff's hay, evidence as to the condition of the fences inclosing the haystacks was admissble, being competent to show what plaintiff had done to distinguish his hay from other hay on the premises, and to serve as a foundation for other testimony on an issue of whether trespass was intentional or willful.

10.  In an action for damages caused by sheep destroying hay on premises in possession of defendants, the admission of evidence as to the condition of the fence enclosing haystacks was not rendered erroneous by an instruction that whether haystacks were enclosed by a lawful or any fence was wholly immaterial, if the jury should find that the sheep had been driven or intentionally permitted to go upon plaintiff's hay; there being no inconsistency between the evidence and the instruction.

11. Where a witness, being cross-examined, evaded giving responsive answers to counsel's questions, and addressed insulting remarks to counsel, such as "You better clean out your ears," the action of court in admonishing witness by a statement, "This is no vaudeville show," and "The court is incensed with the attitude of the witness on the stand," held not objectionable, as against the contention that the court's statement constituted a comment on the credibility of witness.

12. The conduct of a witness may require comment by the court by way of caution, admonition, or censure, and, when such comment is within due bounds and appropriate to the character of the occurrence, it will not be subject to a valid exception.

13. In an action for damages caused by sheep destroying hay stacked on land occupied by defendants, who were charged with willful trespass, an instruction on the duty of the parties as to fences stating that plaintiff was not required to fence, and that it was the duty of defendants to restrain their sheep, held not objectionable as imposing on defendants the duty of guarding plaintiff's hay.

14. An action for damages caused by sheep destroying hay stacked on land occupied by defendants, whether plaintiff could have done more than he did to prevent the damage after discovery of the trespass, held, a question for the jury.

15. In an action for damages caused by sheep destroying hay stacked on land occupied by defendants, a requested instruction that plaintiff could not recover for loss of "any" hay left on land which he could have used, or for a loss of his cattle through lack of food, held properly refused, because plaintiff was not seeking to recover for hay not destroyed, and because he was thereby denied recovery for loss of cattle regardless of quantity of hay left.

16. In an action for damages caused by sheep destroying hay, where the court charged that defendants would not be liable except on proof of a willful driving of sheep on hay or the intentional permitting them to go thereon, a requested instruction that no duty was imposed on the defendants to dog their sheep for the purpose of keeping them from plaintiff's hay was properly refused, as misleading.

17. In an action for damages caused by sheep destroying hay, an instruction that defendants were liable for the acts

of their employes, including the foreman in charge of the sheep, held, warranted by evidence that such foreman was present at the time of the trespass complained of.

18.   Evidence held sufficient to sustain a verdict as to damages for loss of hay destroyed by trespassing sheep and for loss of cattle deprived of food.

APPEAL from the District Court, Johnson County, HON. JAMES H. BURGESS, Judge.

Action by John B. Kendrick against Patrick Healy, Jr., and Alexander Healy, co-partners doing business under the firm name of Healy Brothers, to recover damages alleged to have been caused by trespassing sheep. Judgment for plaintiff and defendant appeals.

*Hill and Griggs, and E. E. Enterline,* for Appellants.

The case was presented by plaintiff in the trial court upon the theory that defendants were bailees of the hay in question. It was sought by the plaintiff during the trial to fix responsibility upon the defendants for the care of the hay, plaintiff declining to assume any responsibility whatever for the care of the hay at the time of the alleged trespass; (5 Cyc. 165; 3 R. C. L. 72); there had been no delivery or acceptance by defendants; at the trial, plaintiff amended his petition by interlineation; thereunder a mass of testimony was received with reference to the character of the fence surrounding the hay stacks, it being the apparent purpose to show that the stacks were surrounded by a lawful fence as defined by Sec. 2578 C. S. 1910, Chapter 18, Laws 1917. This was received over objection of defendants and was prejudicial; damages in such case being limited to horses, mules and cattle who breach a lawful fence, 2581 C. S. 1910.

The court erred in admitting testimony of witness Duffy with reference to hay on the Redman land; the court erred in excluding cross examination of witness Duffy which was material on the question of possession; defendants were under no obligation to keep their sheep away from the vicinity of the stack yards since they were entitled to posses-

sion of all parts of the premises; plaintiff purchased the hay at $3.00 per ton; there was evidence that much of it was spoiled and worthless; plaintiff sued for $20 per ton which was allowed by the jury; neglect of the herder to keep the sheep away from stacks did not establish willful trespass. The agreement between the Northern Wyoming Land Co. and Hoffman was in writing and was therefore the best evidence of the nature of plaintiff's possession; The court's attitude toward the witness Hoffman was prejudicial to defendants and a clear invasion of the province of the jury; a number of instructions given on request of plaintiff were highly prejudicial to defendants and defendants were prejudiced by the refusal of the trial court to give the instructions requested by defendants; it devolved upon plaintiff to make some effort to prevent the alleged damage, (13 Cyc. 71); to use reasonable efforts to lessen the result in damage, (8 R. C. L. 446; Sweeney v. R. R. Co., 25 Mont. 543; Devine Min. Co. 1. Mallin, 165 Pac. 1113); the court instructed in substance that it was defendants' duty to restrain their sheep from going upon plaintiff's hay and that plaintiff was not required to fence or protect his hay against defendants' sheep; this instruction was inconsistent with the other instruction given on the question of trespass. (Eckman v. Westman, 20 Wyo. 143; Pac. 89); defendants' possession of the land was clearly established, and defendants were entitled to an instruction as to their right of possession. (Kahn v. Ins. Co., 4 Wyo. 419); plaintiff was allowed $845.00 for 13 head of cattle alleged to have died for want of feed, when, as a matter of fact, it was shown that plaintiff's cattle had foot and mouth disease, and there was no proof that any cattle had died for want of feed, the verdict of the jury having undoubtedly been influenced by prejudice and passion, and should be set aside.

*Metz & Sackett, and Robert Rose,* for Respondent.

Plaintiff's action for damages caused by trespassing sheep of defendants'; answer first denies generally, and offers affirmative defenses:

1.   An exclusive right to the land where the hay was stacked.

2.   The stacks were unfenced.

3.   Absence of fence precludes the remedy for loss of the hay.

4.   Plaintiff removed the fence.

5.   It was impossible to keep the sheep away from the hay.

6.   The hay was worthless.

The second defense, which includes the foregoing points practically admits intentional trespass; it is admitted that the fence question is immaterial as sheep could pass through a lawful fence; testimony showed that plaintiff's hay was not invaded by the sheep until defendants' hay was all gone and no hay could be obtained in the community; it never was a custom for sheep to run at large; the only fence ever required in the west is against horses and cattle; the right of stock to run at large does not apply to sheep in the care of a herder. (Willard v. Mathesus, 7 Colo. 76; Healy v. Smith, 14 Wyo. 287; Light v. U. S.., 31 SCR. 488, 2 col., 477 foot 2nd col. and top 1st col. 488; Lazarus v. Phelps, 14 SCR. 478, foot 1st col. and 2nd col, arguendo; Cosgriff v. Miller, 10 Wyo. 216-17, 223, 225; Thompson v. Corpstein, 52 Cal. 653); plaintiff had a license from defendant to keep his hay on the premises; the evidence clearly established a license; defendants' sheep were herded away at night and brought back to plaintiff's hay in the morning and were herded into and upon the stacks; the loss of plaintiff's hay also resulted in the loss of about 25 head of cattle; the court placed the burden upon plaintiff of proving that all damages were caused by the intentional trespass; this was certainly as far as the court could go in favor of defendant; the court instructed the jury that defendants

had a right to run their sheep on the premises and were not required to fence plaintiff's hay, but were required not to drive or intentionally permit their sheep to destroy plaintiff's hay; defendants could not well complain of the instructions; the court instructed the jury that it was immaterial whether the stacks were enclosed by a lawful fence or any fence at all, so long as it was shown that defendants intentionally permitted their sheep to go upon and eat and destroy plaintiff's hay. There was nothing misleading about this instruction; there was a clear preponderence of evidence establishing intentional trespass.

POTTER, Justice.

This is an action for damages alleged to have been caused by sheep of the defendants eating and destroying certain hay owned and held in stack by the plaintiff upon certain inclosed premises described in the petition. There was a jury trial, resulting in a verdict and judgment in favor of the plaintiff for the full amount claimed, and the defendants have appealed.

The material averments of the petition, including amendments allowed upon the trial are: That in conducting the plaintiff's business of raising, breeding, buying, selling, ranging, pasturing and feeding cattle in Johnson and Sheridan counties, in this State, it is necessary to buy, own, hold and feed large quantities of hay, especially in the winter time. That for the purpose of feeding said cattle during the winter of 1916-1917 he purchased, owned and held in stack 150 tons of hay on certain described premises. That said premises were surrounded by a lawful fence, and said stacks were surrounded by good and lawful fences maintained by the plaintiff. That during said winter the defendants permitted their sheep in charge of a herder to run upon said hay, and to eat, trample down and destroy it, and that said defendants intentionally and wrongfully drove their said sheep upon said hay and wrongfully fed a part of it to said sheep, and wrongfully caused the sheep to trample down, eat and destroy seventy-five (75) tons of

said hay, which was of the reasonable value of Twenty
Dollars ($20.00) per ton ,and of the total value of fifteen
hundred dollars ($1500.00).

That by reason of the loss of said hay during the said
winter, thirteen head of plaintiff's cattle died, each of the
value of sixty-five dollars ($65.00), and of the total value
of eight hundred forty-five dollars ($845.00). That by
reason of the aforesaid wrongful and unlawful acts of the
said defendants, the plaintiff has sustained damages in the
total sum of twenty-three hundred forty-five dollars
($2345.00), no part of which has been paid. It is also al-
leged that to preserve the remainder of said hay it was nec-
essary to begin an injunction suit, "now pending in this
court."

The answer denies generally each and every allegation
of the petition, and for a second defense alleges in sub-
stance: That the defendants were engaged in the business
of raising, growing, marketing, pasturing and feeding
sheep in Johnson County, Wyoming, and purchased hay
and pasture for use in conducting said business. That in
the fall of 1916 they purchased from W. C. Hoffman & Son,
and the Northern Wyoming Land Company, certain hay
then stacked and located upon the premises described in
plaintiff's petition, and also leased from them, they then
being the owners thereof, all of the pasture located upon
said premises, and by the terms of the lease, became en-
titled to the full, complete and exclusive possession of all
of the said premises, and entitled to run and range their
sheep thereon to the exclusion of any other person or per-
sons, to and including April 1, 1917. That plaintiff had
no right to the possession of any portion of the premises,
but knew that defendants were lessees of and entitled to
the exclusive possession thereof and entitled to run and
range their sheep thereon. That plaintiff negligently failed
to fence his haystacks with a lawful or any fence, although
the defendants repeatedly and frequently demanded that
he care for his said hay and take steps to prevent loss there-

to. That as a result of the plaintiff's said negligence, "all of said fences were down, open and wholly inadequate to keep live stock away from said hay or any part thereof." That in February and March, 1917, plaintiff commenced to feed said hay and to haul it away from the premises, and thereupon plaintiff, by his agents and servants, completely tore down, removed and carried away all of the then inadequate fencing along the sides of three of the stackyards, and opened said yards to the encroachment of stock. That upon the discovery by defendants of the said negligent acts of plaintiff, they protested against the removal of said fences and requested that the same be replaced to properly protect said hay, then informing the plaintiff, "that it was an impossibility to keep sheep away from said hay unless the same was fenced or protection offered therefor." That such damage as was occasioned to said hay was caused wholly by the negligence of said plaintiff, and it was impossible for defendants to have prevented it. That said hay was put up in the season of 1914-1915, and was then in bad condition, and became rotten and mouldy, and entirely unmerchantable, as plaintiff well knew, and of no value.

Plaintiff replied, first denying every allegation of the answer, and for further reply alleging that at the time of the purchase by the defendants of hay and pasture on said premises they knew that plaintiff had in stacks thereon a large quantity of hay, which was inclosed in the stackyards thereon, and that this plaintiff had the right to feed the said hay out upon the said premises during the winter of 1916-1917 to his cattle; that such purchase by the defendants was made with the understanding and agreement that the plaintiff should have a portion of said premises for the purpose of feeding his hay to his cattle during the said winter and following spring; and that the plaintiff had an understanding with the said Hoffman and Son and said Land Company that his hay should remain on said lands to be fed out by him as aforesaid, and with the right to remove the same. The reply further alleges that during said win-

ter the defendants refused plaintiff's request for a portion of the premises on which to feed his cattle, but made no objection to plaintiff keeping his hay on the premises or removing the same therefrom from time to time and recognized the plaintiff's right to the hay and to keep the same in the said stackyards, and to haul and feed the same.

The following facts in the case are established by the evidence without substantial conflict; the plaintiff was engaged in the cattle business and the defendants in the sheep business as alleged respectively in the petition and answer. On November 20, 1915, the plaintiff purchased, under a written contract, from one M. T. Redman, then the owner of the Redman Ranch on Clear Creek, this State, 1154 tons of hay located in stacks upon said ranch, together with all pasture on the ranch, except a small pasture reserved by Redman for his own use, and not involved in this case. By the express terms of that contract the plaintiff was authorized to take possession of hay and pasture at any time after the date thereof, and he was to have barn room for his horses, sheds for his cattle, and the use of the dwelling house upon the ranch while feeding the hay. He agreed thereby to have the hay fed, and redeliver possession on or before April 1, 1916, but it was provided in that connection that if he "shall have any hay unfed upon said place on April 1, 1916, he shall have a reasonable time thereafter within which to dispose of said hay." There was also a provision in the contract requiring Redman to fence the haystacks and the plaintiff to keep up such fences when built.

Of the hay so purchased, which included the crop of 1915 and part of the crop of 1914, about 385 tons remained upon the place on April 1, 1916, and until the early spring of 1917, and that is the hay involved in the alleged trespass. Said hay was left upon the ranch in stacks, and, as we understand, as originally stacked, located in several stack- yards, five or six as we recall the testimony, in an enclosed cultivated field or meadow where alfalfa had been raised,

and about three-quarters of a mile from the ranch buildings which were outside the field.

Sometime ofter the date of the contract aforesaid between Redman and the plaintiff, and prior to April, 1916, the Northern Wyoming Land Company became the owner of the Redman ranch, and that company leased it to one W. C. Hoffman, or to him and his son who are referred to in the testimony as Hoffman and Son, for one year from April 1 or 3, 1916. The lease was not offered in evidence, but W. C. Hoffman testified that he took possession about April 3, 1916, and left about April 3, 1917, and the son testified that he lived on the ranch one year, going there with his father in the spring of 1916, and left there in April, 1917 And it appears also that the lessor and lessee were each to have one-half of the hay crop and pasture.

At the time the Land Company acquired title to the ranch, and leased it to Hoffman and Son, its managing officer knew that the hay remaining in the stackyards in the field in question belonged to the plaintiff, and Hoffman and Son also knew that said hay belonged to the plaintiff when they took their lease, and the elder Hoffman testified that he had no objection to the plaintiff having the hay there. . Before leasing the premises, as aforesaid, the company through its managing officer consented that the plaintiff might keep said hay in said stacks ''that he might feed it.'' While it does not directly appear that Hoffman and Son were parties to that consent, W. C. Hoffman, senior member of the firm, testified that when negotiating with the defendants for the sale of the 1916 crop of hay and the pasture on the ranch he suggested to one of them that if they could make it convenient for the plaintiff to feed his said hay ''someplace there'' he ''would like for them to do it.''

In the fall of 1916 a large part of the hay crop of that year was stacked in the same stackyards with plaintiff's said hay, but in separate stacks, and was then sold in the stack together with the pasture on the ranch to the defendants by Hoffman and Son and the said Land Company; the

one-half interest of each of the latter in said hay and pasture being sold separately but at the same time. By the terms of said sale the defendants acquired the right to feed their sheep upon the ranch until the expiration of the Hoffman lease. Negotiations for the sale having been completed in the latter part of October, 1916, the defendants, shortly thereafter, placed upon the ranch one band of sheep numbering about 2000 or 2200 head. Some time in January another band of their sheep was taken there, and during the winter the defendants fed upon the ranch altogether about 8500 sheep, though all of that number may not have been upon the ranch at the same time. For the purpose of feeding the hay so purchased the same was hauled from the several stacks to a selected feeding ground in the field aforesaid containing said stackyards or in that vicinity on the ranch; and the sheep were at all times in charge of a herder. When the defendants purchased said hay they knew that the older hay in the stackyards belonged to the plaintiff, and they made no objection to that hay remaining there, nor afterwards to its being hauled away by plaintiff for the purpose of feeding the same to his cattle. While Redman was in possession of the ranch each of said stackyards, then containing the hay sold by him to the plaintiff was surrounded and inclosed by a good and substantial barbed wire fence, sufficient to keep out cattle but not sheep, nor were any of the fences inclosing the separate fields of the ranch at any time sufficient to exclude or restrain sheep. And the fences around the stackyards were repaired or rebuilt by Hoffman after getting in the 1916 hay crop, though not in a manner to exclude sheep.

After the defendants had taken possession of said ranch, the Land Company, through its managing officer, offered the plaintiff an enclosed pasture adjoining the field aforesaid in which to feed his said hay to his cattle, and early in March, 1917, 1390 head of his cattle were brought there for that purpose. At that time the defendants had fed to their sheep most of the hay belonging to them in said stack-

yards, but continued to herd a bunch of sheep in said field until an injunction was procured by plaintiff on or about the 20th of March, restraining the defendants from permitting their sheep to trespass upon plaintiff's haystacks.

The plaintiff's employees commenced to haul from his haystacks to the cattle in the adjoining pasture aforesaid on or about the 9th day of March, 1917, or sometime between the 7th and 10th of that month. And, according to the testimony of plaintiff's witnesses, his said employees then observed that parts of the fences around all but one of the haystacks were down, and that the sheep of the defendants had been upon all of the stacks and had been and were eating plaintiff's hay. As it is contended that the evidence introduced to establish trespass is not sufficient to justify the verdict under the law applicable to the case, and that the instructions do not properly state the law applicable to the evidence, it seems necessary to state enough of the evidence on the subject to show its general character and effect and explain the question presented to the jury under the court's instructions. And that cannot be done better than by narrating or quoting part of the testimony of some of the witnesses.

In the first place, to save repetition, it may be stated as a fact testified to by all but one or two of plaintiff's witnesses who testified upon the subject of the alleged trespass, that the winter of 1916-1917 was unusually severe, that there was considerable snow on the ground and badly crusted, and that such condition existed in the field containing said haystacks, so that there was practically no grazing anywhere in the field around or near the stackyards; that in some places the snow had been drifted from outside a stackyard over the fence and against the haystack therein, over which sheep might walk and reach the hay in the stack. It should perhaps also be said here that there is a conflict in the evidence as to the condition of the fences around most of the stackyards at the time and after plaintiff commenced hauling and feeding his said hay to his cattle; said conflict

relating principally to whether the employees of the defendants or plaintiff were responsible for leaving the gates, if any, in the stackyard fences open and parts of the fences down.

John A. Moore, who testified that he had been plaintiff's purchasing agent and had purchased the hay in question for the plaintiff, and who seems to have had general charge of feeding said hay to plaintiff's cattle and of the movements of the cattle to and from the pasture where they were fed, testified in substance with reference to the alleged trespass as follows:

That on March 10th or 11th, he found the end fences, the gates as a rule at the end of the stackyards, open and thrown back, while most of the wires of the side fences were up on the posts and badly "slacked" by sheep running through the fence, that on four occasions he observed sheep of the defendants in the field and at several of the hay stacks at that time, sheep of a band approximating 1800 head, and eating the hay from the stacks; that he told the herder in charge of the sheep to keep his sheep away from the hay; that the herder answered "All right," but didn't keep them away. That later he asked Mr. Rose, the prosecuting attorney of the county, to go with him to the Redman ranch, where he then had a conversation with the herder, as follows: "I told the herder that this man Rose was the Prosecuting Attorney of this county, and that I intended to do something to make Healy keep his sheep away, and the herder said, 'I can't do it.' I said 'Keep them away, or I will put you in jail.' 'Well,' he says, 'I will go to the camp and quit.' I said, 'That is your business, not mine.'" That at that time the herder had the sheep "right around Kendrick's hay on top of the stack." That fully 75 tons of the hay had been eaten up, and some was more or less tainted by the sheep tramping over it and left in bad shape. That all of the stacks were eaten in at the sides and around the ends, some of them badly eaten into—from three feet to the middle of the stack in places. That the herder kept

the sheep at night about a mile north of the stacks at the Redman sheds near the house. He also testified that he first discovered the sheep eating the hay on March 9, and, on cross-examination, that on the stacks where sheep were eating, he noticed approximately 100 head of sheep on two stacks, and approximately 40 or 50 on another. That when he saw the sheep eating plaintiff's hay he noticed also that defendants were hauling from the stacks belonging to them to be fed to their sheep.

H. B. Bandy, another witness for the plaintiff testified that he had made his home at the Redman ranch, about 12 or 14 years, had assisted in putting up the Kendrick hay, and built the fences around the stackyards, and was employed by the plaintiff in February, 1917 and assisted in hauling his said hay to the adjoining pasture. That about the 9th or 10th of March, the fences around the Kendrick hay had been opened, the wire at the ends "laid back"— not all of the yards, but quite a few of them. That he then saw sheep there, all over the haystacks; that he asked the herder to keep the sheep away, and the latter said, "All right." That the second day after that he saw the herder on a haystack with his sheep all around him, and he asked him if he was not going to keep the sheep away, to which the herder replied: "No, he had orders to let them go to it." That the sheep, 1500 or 2000, were around the stack on which the herder was; that they were there all over the hay until after the injunction was served. That the herder took the sheep back to the house in the evening, and in the morning brought them to the haystacks in the field. "He would bring them right down there around the haystacks, every morning." That when the witness first went there, he observed that they (referring probably to the employees of the defendants) were hauling hay from two of the stackyards, and when they came out, they did not close the gates. That there was one stackyard without any gates, the fences being solid and sufficient to keep out horses and cattle, and that all of the hay in it had been eaten up and destroyed,

and he observed indications that sheep had been there. That about 75 or 80 tons of plaintiff's hay had been eaten and destroyed by the sheep, and that quite a bit of it had been trampled down by them. That after the injunction was served, the sheep were kept away from the plaintiff's haystacks. On cross-examination he testified that in one stackyard all plaintiff's hay had been eaten—about 35 tons, and from each of the stacks in the other yards from 3 or 4 tons to ten and twenty had been eaten. That they hauled to the cattle all of the remaining hay that had not been trampled down by the sheep. He testified on cross-examination that when he first saw the sheep around the plaintiff's hay there was "a little butt" belonging to the defendants in the stackyards where the herder and the sheep were; that there was no gate to that stackyard, but the fence was down, and the defendants had been hauling hay from there. That one stack of plaintiff's hay had been caused to·fall over as a result of the sheep eating in under it;.that he had seen them eating there before the stack fell over.

Charles Stagmire, who had assisted in hauling plaintiff's hay to the cattle, testified that when he first went to the field where the hay was the defendants had about 4 tons of hay remaining in one of the yards. That when defendants hauled their hay to be fed they did not put up any gates when leaving; that in one yard where the Kendrick hay was stacked the fence was up, without any gates in it, and that the sheep went back and forth through that fence as though it was not there. That after the defendants had taken their hay out there was no hay in the stackyards except the plaintiff's hay. That the herder of the sheep kept them at night at the Redman ranch and·drove them in the morning to the haystacks; "go on the stacks and stay there." That he had two dogs with him, and made no effort to keep the sheep away from the Kendrick stacks. That the only apparent reason for driving the sheep up around those stacks where no Healy hay was left was to feed them on the Kendrick hay.· Around the stacks where no Healy hay re-

mained there was no pasture which the sheep could eat; the snow was all over the ground and crusted. That the sheep were herded right around the Kendrick stacks. That in feeding the Healy hay to the sheep, it was distributed "right around the stacks."

Said witness further testified that when the witness Bandy had his conversation with the herder, they were at the stacks, and the sheep were there too, on the haystacks, in the yard in which some of the Kendrick hay was, and the sheep were then eating the Kendrick hay, also that he saw the sheep upon all of the Kendrick stacks; that none of the hay in the yard where the fence was all up was hauled for the cattle because it was all eaten or trampled upon and destroyed so that the cattle would not eat it. That when they first went there they put up parts of the fence that were down but it had no effect upon keeping the sheep away; that after the injunction was served the sheep were kept away. That there were plenty of places to keep them and just as convenient for feeding hay to them as to keep them near the Kendrick stacks. That sometimes, before the injunction was served, they brought the hay from their stacks a quarter-mile away to be distributed close around the Kendrick stacks.

A witness, Dunn, who was engaged in hauling plaintiff's hay in March, 1917, testified substantially to the same facts, corroborating the witness Bandy as to his conversation with the herder, and the witness Stagmire as to the sheep being driven to the stackyards each morning and the feeding of the sheep close around the same, and their trespass upon the plaintiff's hay. He said: ."The sheep fed themselves around the stacks; they didn't pay much attention to what they hauled out to them." He also corroborated the other witnesses as to the presence of crusted snow upon the ground, leaving nothing for the sheep to eat except the hay, and he stated that the snow was from 5 inches to 5 feet deep, and in places was drifted against the stacks.

Robert Rose, the prosecuting attorney, testified to going to the Redman ranch with the witness Moore on the occasion mentioned by the latter in his testimony, and corroborated him as to his conversation with the herder. He testified substantially that when Moore asked the herder to keep off the Kendrick hay, he said that he had instructions to let them feed on that hay. He further testified to a conversation that he had with the herder, and that he told him he must not graze the sheep on the Kendrick hay, and that the herder replied that "he had instructions to feed them there." He testified also that the injunction order was dated March 23; and that the name of the herder was John Robinson, a fact mentioned also by other witnesses for the plaintiff, as well as by the witness Shriver, whose testimony is next to be referred to.

The testimony of C. H. Shriver was taken by deposition. He testified that he had worked on the Redman ranch for the defendants—"feeding there for Healy Brothers." Upon being asked to relate the facts that came within his observation with reference to sheep of defendants eating the hay stacked on the ranch in the winter of 1916-1917, he said: "It was after I pulled off that the sheep were there, but after I pulled out I was back there several times, and I seen the sheep on the haystacks, all right." Further, he said; That there were about 2000 sheep in the bunch. That he knew William Huhn, the general foreman for the defendants, and heard the herder, Robinson, "tell Huhn that it was impossible to keep his sheep out of the haystacks if he was going to herd in that pasture, and Huhn told him that it wasn't necessary to keep them out, and that Kendrick would have to fence his hay if he wanted the sheep kept out; that Healy Brothers had bought the pasture and that there was nothing in the deal to specify that they should keep the sheep out of these stacks of old hay." He was then asked to state what Huhn said to the herder as to whether or not he should let the sheep get to the stacks. His answer was: "He said, turn them loose."

There is very little contradiction of this testimony in the record, except with reference to the condition of the fences around the hay stacks.  William Huhn, the foreman in charge of the sheep denied having directed any herders to drive or feed the sheep on the Kendrick hay, and denied also having had the conversation with the herder Robinson testified to by the witness Shriver.  He testified that what he told said herder was that Healy had leased this Redman pasture, and that the only way they could get the benefit if it would be to graze it off.  The testimony as to the quantity of the Kendrick hay eaten and destroyed by the sheep was also disputed by evidence introduced by the defendants, but only by testimony to the effect that when the sheep were first taken to the ranch several of the plaintiff's hay stacks appeared to have been eaten into and around. as if by cattle or horses, and that some of the fences around the stacks were in a condition indicating that they had been opened.

But there was practically no contradiction of the testimony of plaintiff's witnesses as to the fact of the trespass by the sheep upon plaintiff's hay, and the manner in which it occurred.  On the contrary, the witness Huhn testified on his direct examination that he observed that the sheep would crawl through the fences around the stackyards—some going through between the wires, and some over the top on the snowbanks; and on cross-examination he testified that the sheep could and did go under the fences and on plaintiff's haystacks, and also the stacks belonging to the defendants, or to use his words, "Kendrick's hay, and Mr. Healy's, principally."  That every time he saw the sheep around the stacks, three or four times in March, 1917, he saw them go through or under the fence to the plaintiff's hay.  But he also testified that the defendants had hay in the same stackyards, and that owing to the condition of the fences at the time the injunction was served it was impossible to keep the sheep

away from the hay without taking them off the premises. He further testified that the defendants had about 60 or 65 tons of hay in said stackyards on the first of March, 1917, and when the injunction was served about ten (10) tons remained, which was hauled to the sheep and fed to them at the place to which they were moved.

Upon the above recited facts and testimony the appellants contend generally: (1) That the evidence does not show an intentional herding or driving of the sheep upon plaintiff's haystacks, and that under the issues in the case there can be no rightful recovery except for a wilful trespass. (2) That the defendants were in rightful possession of the premises with the right to feed their sheep there, and it was no part of their duty to guard or protect plaintiff's hay, but that it was the duty of plaintiff to protect it against intrusion and damage by the sheep, either by maintaining sufficient fences to exclude them or by guarding the stacks in some other adequate manner. And it is argued in that connection that the case for the plaintiffs was presented upon the erroneous theory that the defendants were chargeable with the duty of guarding and protecting plaintiff's hay and liable for any damage done by their sheep from negligence in herding or caring for them; and that the case was erroneously submitted to the jury upon the theory that it was the duty of defendants to prevent and restrain their sheep from going upon, eating or destroying the hay.

We agree with the contention that the plaintiff would be entitled to recover only upon proof of a wilful trespass. But we think that the case was presented for the plaintiff and submitted to the jury upon that theory, and that the verdict is to be considered as finding that the damage caused by the sheep in eating and destroying plaintiff's hay was the result of a wilful trespass. We are of the opinion also that the verdict so considered, is, in that respect, sustained by sufficient evidence.

In view of the allegations of the petition charging that the sheep were intentionally driven upon the hay and intentionally permitted to run thereon, and eat, trample down and destroy it, and the character of the testimony above stated introduced in support thereof, we think it impossible to understand or consider such evidence as offered or introduced otherwise than to show a wilful trespass, rather than mere negligence of the defendants in caring for the sheep or their neglect of a duty to protect plaintiff's hay. And that the trial court understood that to be the purpose of the evidence appears from the instructions. The evidence so introduced tended to show not merely an accidental or casual trespass such as might occur by the occasional straying of animals without the intention of the owner or person in charge of them, but a trespass resulting from the intentional act or acts of the one who had the animals in his charge. It was clearly the purpose to show by that evidence that the herder had at times actually driven or herded the sheep in one or more of the stackyards and upon plaintiff's hay, and regularly for some time had driven them each day so close to the stackyards that they would naturally and necessarily enter the yards and upon the haystacks, indicating an intention that they should do so. And we see no reasonable escape from the conclusion that the evidence on that subject was sufficient to justify the jury in finding that the sheep were driven upon the hay or, what would be tantamount thereto, intentionally permitted to go thereon.

The instructions, as we understand them, and as we think they must be understood, plainly declared as to the right of the plaintiff to recover that the defendants were liable for the damage done by the sheep to plaintiff's hay if the jury should find that the defendants, through any herder or employee in charge and control of the sheep, had driven or intentionally permitted them to go upon and eat or destroy the hay in question, and did not authorize a verdict for

plaintiff unless the jury should so find. The contention
that the instructions went beyond that by declaring that it
was the duty of defendants to prevent their sheep from
going upon plaintiff's hay will be taken up later.

Unless plaintiff was so far without right in the premises
as to justify a wilful appropriation or destruction of his
property, it is clear that instructions to the effect above
stated as our understanding of those given in this case
would correctly state the law applicable to the facts. (Cos-
griff v. Miller, 10 Wyo. 190, 68 Pac. 206, 98 Am. St. Rep.
977; Haskins v. Andrews, 12 Wyo. 458, 76 Pac. 588; Healy
v. Smith, 14 Wyo. 263, 83 Pac. 583, 116 Am. St. Rep 1004;
Brown v. McCloud, (Or.) 190 Pac. 578; Hall v. Bartholo-
mew, (Utah) 169 Pac. 943; Vanderford v. Wagner, 24 N.
M. 467, (N. Mex.) 174 Pac. 426; Frostenson v. Marshall,
25 N. M. 215, (N. Mex.) 180 Pac. 288; Lazarus v. Phelps,
152 U. S. 81; 14 Sup. Ct. 477; 38 L. Ed. 363; Lazarus v.
Phelps, 156 U. S. 202; 15 Sup. Ct. 271, 39 L. Ed. 397; Light
v. U. S., 220 U. S. 523; 31 Sup. Ct. 485, 55 L. Ed. 570; Shan-
non v. U. S., 160 Fed. 870; 88 C. C. A. 52). In the case
last cited, a suit to enjoin the defendant from driving or
permitting his live-stock to be driven upon a stated Forest
Reserve, it was alleged in the bill that the defendant wrong-
fully and unlawfully, without right or authority, and with-
out obtaining a permit, and without the consent of com-
plainant, its officers and agents, but in disregard of the rules
and regulations of the Secretary of the Interior, ''did drive
and conduct and cause to be driven and conducted, and
permitted, suffered, and allowed to go onto the said reserve,
three hundred head of cattle.'' It appeared that the de-
fendant was in possession of land adjoining the reserve,
that the same was inclosed, but defendant made openings
in the fence on the side toward the reservation, for the pur-
pose of letting stock thereon, and, having turned a large
number of cattle upon his said land, where there was no
water and only pasture enough for about 50 head, they

were left there to drift onto the reserve where there was pasture and water. The court said:

"The appellant denies that he has at any time driven his cattle upon the reserve, and asserts that if they went there, they did so of their own accord, the reserve not being inclosed by the United States, and that he is not accountable for the acts of the cattle in straying thereupon. We do not so regard the evidence, and we think the injunction issued· by the court below may well be sustained on the ground that the evidence shows that the appellant drove his cattle upon the reserve. His home ranch was some 6 to 10 miles distant from the 320 acres inclosed near the reserve. He drove large bands of cattle within the 320 acres, which was inclosed on three sides, but open on the side toward the reserve, and left them there. Of course he knew that they would not and could not remain in the inclosure, for there was no water there, nor sufficient pasture for so large a herd. They did as he evidently expected them to do. They went through the convenient openings which he had made in his fence for that purpose."

The case of Light v. U. S., supra, was also a suit to enjoin a cattle owner from causing or permitting his stock to go or stray upon a forest reserve. It appeared that the defendant owned about 500 cattle and a ranch located two and a half miles to the east and five miles to the north of the reserve; that between the ranch and the reserve was other public and unoccupied land of the United States; that the defendant turned out his cattle to range during the spring and summer, and because of the better grazing on the reserve and superior water facilities there, and the natural tendency of cattle to follow the trails and stream leading from the ranch to the reservation, they· naturally went direct to the reservation. The court said:

"Fence laws do not authorize wanton and wilful trespass, nor do they afford immunity to those who, in disregard of property rights, turn loose their cattle under circumstances showing that they were intended to graze upon the lands of

another.' This the defendant did, under circumstances equivalent to driving his cattle upon the forest reserve. \* \* \* \* It appears that the defendant turned out his cattle under circumstances which showed that he expected and intended that they would go upon the Reserve to graze thereon. Under the facts the court properly granted an injunction. The judgment was right upon the merits, wholly regardless of the question as to whether the Government had enclosed its property.''

In the New Mexico case of Vanderford v. Wagner, supra, a wilful trespass by animals was defined as follows: ''In order to show a wilful trespass on land by animals, the evidence must show that the owner of the animals drove them upon the lands of the injured party, or turned them loose upon other lands, knowing that they would necessarily enter the lands of the injured party, and intended that they should do so.'' And in Utah an instruction was sustained declaring that if the defendant, after notice to keep his cattle off from the uninclosed land of the plaintiff's and with knowledge of the location of such land, ''suffered or permitted'' his cattle to trespass thereon, he would be liable for the damages proven to have been suffered by the plaintiffs by reason of such trespass. (Hall v. Bartholomew, supra.)

In Mower v. Olson, 49 Utah 373, 164 Pac. 482, another Utah case, it appeared that when sheep of defendants were seen on plaintiff's land they were usually seen in the vicinity of a spring of water thereon; that such sheep were in charge of a herder under direction of defendants, and were being held and grazed on public and private lands adjoining and in close proximity to plaintiff's land; that conversations had occurred between the plaintiff and defendants regarding the trespassing of their sheep on the former's land; that the parties had gone over the land together at a time when some of the sheep were grazing thereon, and an attempt was then made to compromise their differences. It was also testified that the herder had stated that he was in-

structed to pay no attenion to the line of plaintiff's land. The court said that the facts afforded very convincing proof that the trespass was wilful and intentional.

We are somewhat uncertain as to how far it is intended by the appellants to deny the right of the plaintiff to have his hay upon the premises in question at the time of the alleged trespass. That he had any such right does not seem to be conceded, and it is asserted in the brief of appellants that plaintiff's right under the Redman contract has ceased, and that they, the appellants, had the right to herd their sheep upon every part of the premises where the hay was situated. . It was stated in one of the instructions that even though the jury should find that the defendants were entitled to the exclusive possession of the premises and that the plaintiff had no rights thereon, that fact would not give defendants the right to drive or intentionally permit their sheep in charge of a herder to go upon plaintiff's hay and eat and destroy it. And that correctly stated the law. (Temple v. Duran (Tex.) 121 S. W. 253; Reader v. Moody, 48 N. C. (3 Jones L.) 372. But we think it clear that plaintiff's hay was upon the premises rightfully by license:

First, by the provision in the Redman contract that the plaintiff should have a reasonable time after April 1, 1916, the date when he was to redeliver possession of the ranch, within which to dispose of the hay then remaining unfed upon the place, followed by the express consent before that date of the Land Company upon its acquiring the title to the ranch that the said hay might remain there to be fed by the plaintiff, and later by the tacit consent of Hoffman, the Company's lessee, as shown by his acts and statements, and the tacit consent also of the defendants, who not only made no objection to the hay remaining there when informed that it belonged to plaintiff, and asked by Hoffman to allow it to be fed on the premises if convenient, but, as testified by one of them, he told Hoffman that the plaintiff could haul his hay down to the Healy place (an adjoining ranch) and feed it, without then or at any time suggesting

its immediate removal, or that it be removed before the plaintiff was ready to feed it. For a license may be created by parol as well as in writing, and it may be implied from the acts of the parties, from their relations, and from usage and custom; and when the owner of land, with full knowledge of the facts, tacitly permits another repeatedly to do acts upon the land, the license may be implied from his failure to object. (25 Cyc. 641, 642, 649, 650; Spaulding v. Nesbit, 87 Mo. App. 90; Giles v. Simonds, 15 Gray 441; 77 Am. Dec. 373; Williams v. Flood, 63 Mich. 487, 30 N. W. 93; Macomber v. D. L. & N. Railroad Co., 108 Mich. 491; 66 N. W. 376; 32 L. R. A. 102, 62 Am. St. Rep. 713; Emerson v. Shores, 95 Me. 237; 49 Atl. 1051; 85 Am. St. Rep. 404; Jordan v. Wyatt, 4 Gratt. 151; 47 Am. Dec. 720; Mowrey v. Davis (Ind. app.) 12 Ind. App. 681, 40 N. E. 1108; Temple v. Duran, supra.,) The case of Spaulding v. Nesbit, supra, was decided upon facts analogous in some important respects to the facts here. The appellant had bought from the other party 40 acres of meadow-grass with the privilege of harvesting and stacking it on the premises. After the crop was cut and ricked the landowner notified him that he wanted to turn some young cattle to pasture on the meadow, and requested that the hay ricks be fenced to protect the hay from such cattle, suggesting the kind of fence that would be sufficient. Such a fence was constructed by appellant inclosing the ricks, and thereafter during a snow storm cattle were turned upon the meadow when they could not reach the growing grass on account of the depth of the snow, and they broke down the fence and ate and destroyed a part of the hay. The court said:

"The appellant's hay was on the respondent's premises by his permission—by his license. He had done what respondent suggested would protect the hay from the kind of cattle he said he would turn on the meadow. Without notice he turned on a large number of cattle at a time and under circumstances that insured the breaking of the fences and the consumption of appellant's hay, and if there is no

countervailing testimony he should be required to repay the damages his cattle occasioned the appellant.''

It having been made to appear that the lease to Hoffman was in writing and contained no reservation with reference to plaintiff's hay, certain questions calling for the testimony showing the consent of the Land Company were objected to as incompetent, and the rulings admitting such testimony are here specified as error. It seems to be contended that the written lease was the best evidence, and that the fact that it omitted any reservation permitting the plaintiff to allow his hay to remain upon the premises rendered incompetent other evidence showing the owner's permission. We think that what has been said above as to license sufficiently answers the contention. If it be conceded that Hoffman would not have been bound by the previous verbal consent of the lessor, that certainly would not prevent the plaintiff from proving such consent to show a previous license, and the subsequent consent of the lessee, express or implied, recognizing and continuing the license. The plaintiff was not a party to the lease, and the fact that it contained no provision on the subject did not require or render proper the exclusion of proof to show written or verbal permission. Clearly it was not the best evidence of what plaintiff was seeking to prove, viz: a license to keep his hay upon the premises. For the same reasons there is no merit in the further contention that the court erred in admitting testimony to show the knowledge of Hoffman, the lessee, that the hay belonged to Kendrick.

Appellants have also specified as error the rulings of the trial court admitting in evidence, over objection, the testimony of several of plaintiff's witnesses showing the fact that fences had been constructed inclosing the haystacks and describing the same as built and the condition thereof before and at the time that the defendants took possession of the premises. The stated objections were, generally, that such evidence was immaterial and irrelevant. And it is here argued that the evidence was evidently offered to

prove that the hay was enclosed by lawful fences, an immaterial matter for the reason that the statute defining a lawful fence was enacted only to give a right of action against the owner of horses, mules, or cattle breaking into a lawful enclosure, so that the only purpose and effect of such evidence was to mislead the jury into the conclusion that the plaintiff had done all that was required of him if a lawful fence was maintained around the hay or stackyards, and that defendants would be liable if their sheep broke through such a fence. And, further, that the court instructed the jury that whether the haystacks were inclosed by a lawful or any fence was wholly immaterial if the jury should find that the sheep had been driven or intentionally permitted to go upon plaintiff's hay, and that the evidence concerning the fences was admitted for the purpose only that the jury might better understand the situation with reference to the hay at the time of the alleged trespass.

The court did so instruct the jury, and we think correctly as to the liability of defendants upon a finding that they had driven or intentionally permitted their sheep to go upon the hay of plaintiff and eat or destroy it. But we think it clear that it was competent and proper for the plaintiff to show what had been done to inclose or protect his hay or to distinguish it from other hay in the pasture or upon the ranch, and that the fact or facts brought out by such evidence might ultimately appear to be immaterial because of proof sufficient to satisfy the jury that the trespass was wilful and intentional would not necessarily make the admission of the evidence erroneous. The court by the instruction referred to did not say that the evidence as to the building and condition of the fences was immaterial, but only that in case of a certain finding as aforesaid the fact whether the hay was inclosed by a lawful or any other kind of fence would then be immaterial. We do not think that the rulings admitting the evidence and the words of the instruction mentioned are necessarily inconsistent.

Nor do we think that the sole object of the evidence was merely to prove that lawful fences were built and maintained around the hay, or to establish by that fact alone the liability of defendants, or that the evidence did in fact prejudice the jury, or tend to do so, by misleading them as suggested by the argument. It was conceded by all the witnesses that the fences as built, whether lawful or otherwise, would not exclude sheep, and it is conceded here by counsel that the lawful fence defined by statute will not necessarily and is not intended to prevent the entry of sheep, and for the reason, no doubt, that sheep are usually in charge of a herder, and seldom, if ever, in large herds or numbers allowed to run at large, at least in this section of the country. It was also shown that the fence surrounding and inclosing the pasture containing the haystacks, while it may have been a lawful fence as defined by statute, would not exclude or restrain sheep. The evidence objected to was evidently intended to be followed by testimony which was introduced tending to show that when plaintiff's cattle were brought to the adjoining pasture to be fed the fences or some of them around the hay were partly open or laid down; and this clearly, we think, for the purpose of showing a situation to be considered with other facts upon the issue as to whether the trespass was intentional and wilful. And we think the evidence may have had a material bearing upon that quetsion, and without prejudicing or misleading the jury. Indeed, as the case was submitted to the jury by the court's instructions it was impossible for the jury to understand that the fact that a lawful fence may have inclosed the hay would alone make the defendants liable. If there is any inconsistency in the case as to this question, it would seem to be in the position of counsel for appellants who, while insisting that the admitted evidence as to the fences built and maintained around plaintiff's hay was immaterial, and should have been excluded on that ground, contends that it was plaintiff's duty under the circumstances to guard and protect his hay against the sheep of

the defendants, either by fences sufficient to keep out sheep or in some other adequate manner.

It is further urged as ground for reversal that certain remarks of the court in admonishing or reproving a witness amounted to prejudicial misconduct. Troy Hoffman, a witness for defendants, having testified that he had lived on the Redman ranch with his father, W. C. Hoffman, and that when he went there the Kendrick hay, stacked in 1915, was very poor, solidly packed and mouldy, and that he had seen it being fed to plaintiff's cattle in the spring of 1917, was asked on cross-examination this juestion: "Now, isn't it true that any stack of hay that would stand for that length of time would necessarily be packed hard?" We quote, following that, from the record:

"A. Under the conditions of the weather—Q. Will you answer my question? A. All right. Q You can answer that by yes or no. I wish you would read the question to him, and I would like an answer to it. I would like if the court please, that the witness be required to answer the question.

"By the Court: This is no vaudeville show, and if you sit up there and pay attention to the questions that are asked you and answer up so the jury and counsel and court will hear you I would be much obliged to you.

"By Mr. Enterline: We desire to take exception to the remarks of the court, and ask the court to instruct the jury not to pay attention to the criticism of the witness.

"By the Court: The court is incensed at the attitude of the witness on the stand. You may have your exception."

The question was then read, and the witness, first asking if it was desired that he answer the question again, and being informed by examining counsel that he would like an answer, stated: that "a stack of hay that would be settled that long would naturally be stuck, but if it was stacked in good condition it wouldn't be mouldy, musty." Thus, it appears not only that it was possible for the witness to give a direct answer to the question, but that in doing so,

he added something not called for and not pertinent to the question.

It is contended that the court's remarks invaded the province of the jury to determine the credibility of witnesses, and were prejudicial to the defendants by placing the witness in a bad light before the jury. The remarks are referred to in the brief as expressing the court's "feeling" and "hostile attitude" toward the witness, and it is stated that the record contains nothing to justify that. We conceive it to be a mistake to describe or consider the remarks as an expression of hosility to the witness. Coming from the judge presiding at the trial they indicate merely the court's resentment or indignant displeasure at the conduct or "attitude" of the witness, and evidently not alone the attempt to inject into his answer something not called for, or his disposition to do that, as shown from almost the beginning of his cross-examination, but also his manner of testifying, his demeanor and posture on the stand. Certainly, considering the place and the occasion, the remarks do not indicate that they were spoken to or of the witness by one unfriendly or antagonistic to him, and they could not reasonably have been so understood. Indeed, the first remarks, to which counsel excepted, did not express a feeling other than mere disapproval. The remark that "this is not a vaudeville show" is not specifically explained in the record, but should be understood, we think, as intended to show disapproval of some conduct or attitude of the witness indicating a lack of appreciation of the place and purpose of the trial. And we find some ground for that in a remark of the witness hereinafter referred to, previously addressed to counsel conducting the cross-examination. The statement that the court was incensed at the attitude of he witness was brought out by the exception and the added request that the court instruct the jury to pay no attention to the criticism of the witness, or, in other words, that the court withdraw the remarks excepted to.

No exception was taken to that statement. But in nothing that the court said was there an expression of opinion or comment upon the truthfulness or credibility of the witness, nor were the remarks, in our opinion, so severe as to require that they be held prejudicial. We think it appears from the language of the court addressed to the witness, that it was intended only as a caution to pay attention to the questions and answer so as to be heard, and that the occasion was not one for levity. That the court may properly do, without reflecting upon the character or credibility of the witness, if warranted by what has occurred. It occasionally happens that some occurrence upon a trial will warrant and may require comment by the court upon the conduct of a witness, by way of caution, admonition or censure, and when such comment is within due bounds, and appropriate to the character of the occurrence, it will not be subject to a valid exception. (26 R. C. L. 1028; Cross v. Syracuse, 200 N. Y. 393, 94 N. E. 184, 21 Ann. Cas. 324; 38 Cyc. 1315, 1316; State v. King, 88 Minn. 175, 92 N. W. 965; Mullins v. Nordlow, 170 Ky. 169, 185 S. W. 825; Bartlett v. Bartlett, 40 S. D. 544, 168 N. W. 633; Schaffner v. Massey Co., 270 Ill. 207, 110 N. E. 381; Goodeve v. Thompson, 68 Or. 411, 136 Pac. 670, 137 Pac. 744; Gibson v. McLane, 17 Ariz. 61, 148 Pac. 288; Aetna Life Ins. Co. v. Kramer, (Okla.) 165 Pac. 179).

In State v. King, supra, the court had reprimanded a witness and threatened him with punishment for contempt if he persisted in what the court thought was an attempt to inject evidence into the case not called for by questions put to him, and it appeared from the record that the answers of the witness were not always responsive, but included matters not called for or pertinent to the questions asked him, and that he was friendly to the defendant and hoped that his testimony would aid in his acquittal. The appellate court said that the remarks excepted to were made for the purpose of rebuking the witness and admonishing him to confine his answers to matters pertinent to the questions,

and that they did not reflect upon the truthfulness of the witness, and were not therefore just ground for reversal. In concluding the matter, the court stated the rule as follows:

"Trial courts often find it necessary, and it is a discretionary right and duty, in the interests of an orderly trial, to rebuke and in a measure suppress over-zealous or over-willing witnesses, and at times with emphasis, and this right and duty to do so cannot well be questioned or curtailed."

In the Oregon case cited, a witness was reproved for including argument in his testimony, and, again, for nodding his head and making demonstrations in the courtroom. The court said: "Evidently the judge thought he was attempting to exert an influence on the jury or the witnesses, and, if so, it was the court's duty to reprove him and prevent such conduct." In the case of Bartlett v. Bartlett, supra, the language excepted to was: "Now, Mr. Bartlett, you will please answer the questions as they are asked, and you will do it in a decent and respectful way, and if you don't you will pay some of the expenses of this court, and you don't want to talk back to the court either." The court said:

"Enough of the record is disclosed to show that the defendant's attitude upon the witness stand to have been flippant and insulting, and that he frequently volunteered matter not responsive to the questions propounded. Unfortunately, the printed record cannot disclose a phonographic reproduction of the voice of the witness nor a photographic reproduction of his manner upon the witness stand. We are unable to say from the record that the trial court abused that judicial discretion that is committed to it."

In this case the witness, upon his cross-examination, had shown not only a disposition to evade a direct answer to questions by injecting something not responsive, but, on two occasions shortly prior to the proceeding complained

of, addressed impudent and insulting remarks to the counsel examining him, and this conduct tends partially at least to explain the reason for the reproving remarks of the court. A question having been asked requesting an answer to a preceding one to which a direct answer had not been given, he said, beginning his answer: "You better clean out your ears." And, again, under like circumstances, he said: "You better take the dirt out of your ears." The questions seem to have been proper and had apparently been propounded in a courteous manner, and counsel so addressed does not seem to have offered any provocative or retaliatory remarks. Taking the language of the court as indicating the character of the conduct of the witness, together with the facts above stated, in the absence of any other or further disclosure of the situation by the record, the remarks complained of cannot be held objectionable as beyond the court's discretion.

The contention that the instructions imposed upon defendants the duty of guarding and protecting plaintiff's hay against their sheep is based upon a sentence found in the second instruction, viz: "It was the duty of the defendants to prevent and restrain their sheep from going upon, eating or destroying plaintiff's hay." If that stood alone it might be ground for the contention, and would be objectionable if referring or applied to an accidental or casual instead of an intentional or wilful trespass. But it is only a part of the instruction, and clearly had no reference to a mere casual trespass by sheep straying from the herd. The court was speaking of the evidence relating to the fences and the duty of the parties in respect thereto, under the circumstances of the case. The entire instruction reads as follows:

"The court permitted the introduction of evidence as to the construction and condition of the fences around the stacks of hay in question in this case, and around the premises known as the Redman ranch. The court permitted the introduction of this evidence for the purpose that you might

better understand the situation as it existed in reference to the stacks of hay in question during the time of the alleged trespass of the defendants' sheep thereon, and it is only for this purpose you may consider it. The plaintiff was not required under the circumstances of this case to fence or protect his hay stacks against the defendants' sheep. It was the duty of the defendants to prevent and restrain their sheep from going upon, eating, or destroying the plaintiff's hay. It is, therefore, wholly immaterial whether the hay stacks of the plaintiff, or the premises upon which they were situate were enclosed by a lawful fence, or any fence at all, so long as you find that the defendants, through their herders in charge and control of their sheep, drove or intentionally permitted their sheep to go upon and eat or destroy the hay of the plaintiff in question."

It was evidently the theory of the court that under the issues and evidence a verdict against the defendants would be proper only in the event of a finding that they, or some employee in charge of the sheep, had driven or intentionally permitted them to go upon and eat or destroy the plaintiff's hay. That is the effect not only of the above instruction but of the other instructions also. In the next succeeding instruction, to which we have referred in discussing the question of plaintiff's right upon the premises, it was said, that though the jury may believe from the evidence that defendants were entitled to the exclusive possession of the premises, and that the plaintiff had no rights thereon, that fact would not give them the right to drive or intentionally permit their sheep in charge and control of a herder to go upon the plaintiff's hay and eat and destroy it, and, though so finding as to the right of possession, the defendants are liable for any proven damages caused by them, if it be found that they, through any herder or employee while in charge and control of their sheep drove or intentionally permitted said sheep to go upon and eat or destroy the plaintiff's hay.

In the fourth instruction, which refers to no other matter than what will justify a verdict in favor of the plaintiff, the same principle is stated. We quote all of the instruction:

"You are instructed that if you find from the evidence that the herders or employees of the defendants while in charge and control of defendants' sheep drove or intentionally permitted their sheep to go upon the plaintiff's hay and eat it or destroy it, then the defendants are liable to the plaintiff for the damages if any done thereby."

And there was no instruction authorizing a verdict for plaintiff upon any other finding than that mentioned in the foregoing instructions. We think it apparent, therefore, that the court intended by the clause in the second instruction as to the duty of defendants to restrain their sheep nothing more than that it was the duty of defendants to refrain from driving or intentionally permitting their sheep while in charge of a herder to go upon the hay, and in that sense only to restrain their sheep from going thereon. This is further indicated and, perhaps, made clearer, by instructions nine and thirteen.

The 9th instruction declares that the defendants had a lawful right to run and pasture their stock upon the lands upon which plaintiff's hay was situated, and no duty was imposed upon them by law to fence in the plaintiff's haystacks or to keep the same in repair, but that it was their duty to see to it that they did not drive or intentionally permit their sheep to go upon, eat, or destroy plaintiff's hay. The 13th instruction declares that as against the plaintiff the defendants had a right to run, feed, and graze their stock anywhere upon the premises, and were not compelled to run, feed, or graze such stock upon any particular place upon the ranch, except that they had no right to run, feed, or graze their stock upon the plaintiff's hay, situate upon the premises.

We repeat, therefore, that, in our opinion the case was submitted to the jury upon the theory that the plaintiff

would be entitled to recover only upon proof or a wilful trespass. And we see no reasonable ground for supposing that the jury may have understood from the instructions that a duty was imposed upon defendants to protect plaintiff's property otherwise than to refrain from driving or intentionally permitting their sheep thereon.

The refusal of several instructions requested by the defendants is here specified as error. Those in conflict with the views above expressed need not be specially considered. As to some of the others, they were included, with proper modifications, in the instructions given. For example: Requested instruction "S" was to the effect that the defendants had a lawful right to run and pasture their stock upon the premises, and were not charged with the duty to fence in plaintiff's hay, or to keep any such fence in repair, or to guard the hay from any depredations that might be committed by their stock while running and grazing upon the premises. The first part of this request was given in the court's 9th instruction, but the statement that it was not the duty of defendants to guard the hay from depredations by their stock was omitted, and in place thereof it was stated it was their duty to see to it that they did not drive or intentionally permit their sheep to go upon, eat, or destroy the hay. And such modification was proper.

The court's instruction 13 was substantially requested instruction "T", except that the court's instruction properly contained an added provision to the effect that the defendants had no right to run, feed, or graze their sheep upon the plaintiff's hay. Requested instruction "L" stated that if it should be found from the evidence that the stock of defendants did eat, injure, or destroy any portion of plaintiff's hay, then it became plaintiff's duty, immediately upon the discovery of such action, to use every reasonable precaution and diligence to prevent further damage, and having failed so to do, the plaintiff cannot recover for any damages sustained after such discovery. One apparent infirmity in that request is that it assumes that plaintiff had

failed, upon discovery of the trespass, to use reasonable precaution and diligence to prevent further injury and damage, instead of leaving the question to the jury. The court, however, by instruction No. 12, stated to the jury that if they should find that plaintiff had suffered damage by reason of wilful acts of defendants, then it became his duty, immediately upon discovery of such acts, to exercise all reasonable diligence and precaution to reduce the damages, and he could not recover for damages that could have been avoided by the exercise of such reasonable precaution and diligence. Thus, the instruction as given is substantially the same as the one requested, except that it left the question to the jury whether or not the plaintiff had failed to use reasonable precaution and diligence.

It is contended, however, that the instruction given on the subject was erroneous because it did not state that if plaintiff could have prevented the injury entirely it was his duty to do so, also that the evidence discloses no attempt to prevent damage, but on the contrary, that the plaintiff made it easier for the sheep to go on the hay by taking down the fences, and that the instruction should have stated that the plaintiff had failed to use proper precaution. But, as previously stated, the evidence is conflicting as to who had removed or opened parts of the fences. And we find nothing in the evidence disclosing that it was reasonably possible for the plaintiff to have done more than he did do to prevent or reduce the damages after the discovery of the trespass. At any rate the matter was properly left to the jury. There is nothing in the evidence upon which the court could base a conclusion that the plaintiff had not been as diligent as circumstances permitted in protecting his property from further injury. It does appear that after the herder's refusal to keep the sheep away from the hay, the plaintiff proceeded at once to obtain an injunction. We do not find the injunction order in the record, and therefore are not informed as to its terms, except that it was to prevent the

defendants from allowing their sheep upon the hay; and it appears that it had that effect.

Another requested instruction was to the effect that if when plaintiff drove his cattle away there was any hay left lying upon the land which he could have used to feed them, then he could not recover for the loss of the hay so left, nor for the loss or depreciation in value of any of his cattle. By the 8th instruction given the plaintiff was limited in his right to recover the value of the hay eaten or destroyed to 75 tons, evidently because that was the quantity alleged by the petition to have been eaten or destroyed, and within that limitation the question as to the quantity and value of hay eaten or destroyed, and whether any of plaintiff's cattle died as the proximate result of the loss of the hay shown to have been eaten or destroyed, was submitted to the jury to determine upon the evidence. The requested instruction was properly refused. The plaintiff was not seeking or allowed to recover the value of any hay not eaten or destroyed, and it certainly would have been improper to tell the jury that if *any* hay was left lying upon the premises, regardless of the quantity, which might have been used to feed the plaintiff's cattle, he could not recover damages for the loss of any of his cattle through lack of food. For as to damages for the loss of cattle that was the effect of the requested instruction, even though the quantity of the remaining hay might have been entirely insufficient to prevent the loss.

Appellants complain also of the refusal of the court to give an instruction to the effect that no duty was imposed upon the defendants to dog their sheep for the purpose of keeping or driving them away from plaintiff's hay. But since the court stated to the jury in effect that the defendants would not be liable except upon proof of the wilful driving of their sheep upon the hay, or the intentional permitting them to go thereon, the said instruction would have been misleading.

The court's instruction No. 7, which declared the defendants responsible and liable for the act of their employees, including the foreman Huhn, whom they had placed in charge of and in control of the sheep, is complained of for the stated reason that there is no evidence to establish or prove that said foreman was present during the time of the commission of the alleged trespasses. But that does not state the evidence correctly. The record shows, as stated above when reciting the evidence, that said foreman testified that he had seen the sheep go through the fence to the hay on three or four occasions, and there was testimony to the effect that he had instructed the herder to let the sheep go upon the hay.

It is contended that the evidence was insufficient to sustain the verdict as to the amount of the damages allowed. There was a direct conflict in the evidence as to the condition and value of the hay that was eaten or destroyed, but the evidence was in our opinion clearly sufficient to sustain the verdict in that respect. We do not recall any conflict in the evidence as to the number of cattle that died. As to the cause of their death there was testimony to the effect that some of plaintiff's cattle in the latter part of the winter had been affected with a disease commonly called a sore mouth or the mouth disease, tending to create a conflict in the evidence as to the cause of the death of the cattle. But it appeared also that such disease was fatal in only a small percentage of cases, and then because of inability to eat, that its chief effect is to interfere with the animal eating during its progress lasting from one to two or three weeks, liable to result in weakening the condition of the animal and loss of weight; and one witness testified that the cattle so affected had been inspected February 28 and pronounced all right. It was shown also that with sufficient food the animal would soon be brought back to normal condition and that it is important that they be not deprived of food at such a time. The expert witness, a Federal Veterinary Inspector, who testified as to the presence of the

disease among said cattle, admitted that a shortage of hay at the beginning of spring would cause depreciation in practically every such animal and that more damage would result to the weaker animals by being deprived of the necessary hay at that time than to an ordinary herd that had not been diseased. While the evidence was more or less circumstantial as to the cause of the death of the animals for which damage was claimed, we are unable to say that it was insufficient to sustain or justify the verdict.

We find nothing in the record to furnish any proper support for the assertion in the brief of the appellants that they were not given a fair trial, but we think the contrary clearly appears. We might go further into this matter and explain our reasons for so concluding, but do not think that necessary. Other matters complained of by the appellants, mainly rulings upon the admission of evidence, are not, we think, of sufficient importance to require special discussion. Such matters have been considered and we are satisfied that no error was committed concerning them. As indicated by what has been said, we find no prejudicial error in the record, and the judgment will be affirmed.

*Affirmed.*

BEARD, C. J., and BLYDENBURGH, J., concur.