2003 WY 122

Kenneth W. MARKSTEIN and Carole Markstein, Appellants (Plaintiffs),

v.

COUNTRYSIDE I, L.L.C., a Wyoming limited liability company; Countryside, L.L.C., a Wyoming limited liability company; John C. Thornton; Thunder Holdings, LLC, a Wyoming limited liability company; Finis F. Connor and Julie A. Connor, as Trustees of the Connor Family Trust; John R. Tozzi and Georgene M. Tozzi, as Trustees of the Tozzi Family Trust; Kenneth H. Taylor, Jr., as Trustee of the Agreement of Trust of Kenneth H. Taylor, Jr.; G. Dorros Family Limited Partnership, a Wisconsin limited partnership; Targhee Pines, L.C., an Idaho limited liability company; Joseph Kraus, IV; The Jackson Hole Land Trust, a Wyoming non-profit corporation; and LaSalle Bank National Association, an Illinois banking association, Appellees (Defendants).

No. 02–214.

Supreme Court of Wyoming.

Sept. 26, 2003.

Rehearing Denied Oct. 21, 2003.

See also *Masinter v. Markstein,* 2002 WY 64, 45 P.3d 237 (Wyo.2002).

Representing Appellants: R. Michael Mullikin and Carolyn L. Null–Anderson of Mullikin, Larson & Swift, Jackson, WY; and Harvey S. Schochet, and Andrew A. Bassak of Steefel, Levitt & Weiss, San Francisco, CA. Argument by Messrs. Mullikin and Schochet.

Representing Appellees: David F. DeFazio of DeFazio Law Office, Jackson, WY; Gerald R. Mason of Mason & Mason, PC, Pinedale, WY; Bret F. King of King & King, Jackson, WY; Peter J. Young of Schwartz, Bon, Walker & Studer, LLC, Casper, WY; and Joe M. Teig of Holland & Hart, Jackson, WY. Argument by Messrs. Mason and DeFazio.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

LEHMAN, Justice.

[¶ 1] This is an appeal from summary judgment granted against appellants Kenneth W. Markstein and Carole Markstein (collectively the Marksteins) in an action concerning fishing and club use rights granted along the Snake River near Wilson, Wyoming. We affirm in part, reverse in part, and remand.

### ISSUES

[¶ 2] The Marksteins set forth very lengthy and broadly stated issues on appeal that may be summarized as follows:

1. Did the district court err in disregarding the effect of the bankruptcy court's orders?

2. Did the district court err in not finding a breach of the Stipulation Re License Claims?

3. Did the district court err in concluding that the fishing license agreements did not create an interest in real property that ran with the land but, rather, were revocable licenses that were terminated upon purchase of land?

4. Did the district court err in finding a proper revocation of the Marksteins' club use rights?

5. Did the district court err in its finding of bona fide purchaser for value status under the Wyoming Recording Act?

Appellees John C. Thornton; Countryside, L.L.C.; Countryside I, L.L.C.; Thunder Holdings, LLC; John R. Tozzi and Georgene M. Tozzi, as trustees of the Tozzi Family Trust; Targhee Pines, L.C.; The Jackson Hole Land Trust; and LaSalle Bank National Association (collectively appellees) do not specifically set forth a statement of issues on appeal. However, appellees address those

issues raised by the Marksteins and raise the following additional issues:

1. Did the trustee in bankruptcy reject the Marksteins' fishing license and club use agreements as executory contracts in the bankruptcy case?

2. Was the recording of the license agreement for Parcel 2 void as a violation of the bankruptcy automatic stay provision?

3. To the extent that the fishing license agreements are easements, are they null and void under Wyo. Stat. Ann. § 34–1–141 for failure to provide a sufficient legal description?

### FACTS[1]

[¶3] In 1981, Rivermeadows Associates, Ltd. (RMA) developed Crescent H Ranch, a commercially operated guest ranch located along the Snake River. Thereafter, Fish Creek Meadows, Inc. (FCM) developed 186 acres adjacent to Crescent H Ranch (Fish Creek Meadows Property).

[¶4] In 1993, the Marksteins purchased Parcel 1 of the Fish Creek Meadows Property, in part, acquiring fishing and club rights on the Crescent H Ranch. No memoranda for the fishing and club rights regarding Parcel 1 were recorded. Nevertheless, terms of the Parcel 1 purchase provided that if Parcel 1 was split, duplicate fishing and club rights would immediately issue with that newly split parcel. In April of 1994, the Marksteins completed a lot split of Parcel 1.

[¶5] On January 16, 1995, RMA granted FCM fishing rights to the Crescent H Ranch, which was appurtenant to Parcel 2 of the Fish Creek Meadows Property. On January 17, 1995, RMA filed for Chapter 11 bankruptcy with RMA operating as a debtor in possession until a trustee in bankruptcy was appointed for the bankruptcy estate in July of 1995. Later that same day, RMA recorded a Memorandum of License Agreement regarding fishing rights involving Parcel 2.[2]

Subsequently in 1995, FCM also filed for Chapter 11 bankruptcy.

[¶6] On November 12, 1996, the trustee in bankruptcy for the RMA bankruptcy estate and appellee John C. Thornton (Thornton) entered into a purchase agreement concerning the Crescent H Ranch. This agreement provided that the sale was subject to all existing fishing and club use rights relating to the Crescent H Ranch, except to the extent such rights were "avoided" in the bankruptcy. On that same date, Thornton assigned all his rights and obligations under the purchase agreement to appellee Countryside, L.L.C. On December 30, 1996, appellant Kenneth A. Markstein purchased Parcel 2 of the Fish Creek Meadows Property through the trustee of the FCM bankruptcy estate. No memorandum for club rights concerning Parcel 2 was recorded although such rights were again apparently extended pursuant to the purchase.

[¶7] In January 1997, the trustee for the RMA bankruptcy estate filed an avoidance action seeking to, in part, avoid the Marksteins' fishing rights. On May 12, 1997, that same trustee along with Countryside, L.L.C. requested by motion that the bankruptcy court approve the proposed purchase of the Crescent H Ranch. The Marksteins objected to these motions. On June 10, 1997, the Marksteins and others entered into a Stipulation Re License Claims with the trustee of the RMA bankruptcy estate and Countryside, L.L.C. wherein Countryside, L.L.C. agreed that any challenge it might wish to assert to the fishing and club use rights would be limited to the "claims asserted by the trustee" in the avoidance action. On June 13, 1997, the bankruptcy court approved the sale of the Rivermeadows property to Countryside, L.L.C., but ruled that the sale "shall not be free and clear of the interests of those fishing license and use agree-

---

1. An appeal in this action was previously filed, with this court issuing its opinion in that matter at *Masinter v. Markstein,* 2002 WY 64, 45 P.3d 237 (Wyo.2002).

2. Appellees assert that to the extent the Marksteins must rely upon the post-petition filing of this memorandum to protect their claim, the

recording is void as a violation of the automatic stay. Under our reasoning detailed below, the Marksteins need not rely upon the post-petition filing of this memorandum. Accordingly, this court does not address such issue because it is moot.

ment holders." Countryside, L.L.C. assigned its rights and obligations under this sale to appellee Countryside I, L.L.C. on June 25, 1997. The Stipulation Re License Claims was approved by the bankruptcy court on July 21, 1997.

[¶ 8] On February 25, 1998, the bankruptcy court dismissed the avoidance action filed by the RMA bankruptcy trustee seeking to avoid the Marksteins' fishing and club use rights. Nevertheless, on April 2, 1998, Countryside I, L.L.C. sent a letter to the Marksteins disavowing their fishing and club use rights.

[¶ 9] On November 23, 1998, the trustee for the RMA bankruptcy estate filed his Third Amended Liquidating Plan of Reorganization ("Plan of Reorganization"). On December 3, 1998, the bankruptcy court entered its order confirming the Plan of Reorganization.

[¶ 10] This action was filed in district court by the Marksteins seeking to enforce their fishing and club use rights. Ultimately, cross-motions for summary judgment were filed by the parties, with the district court entering summary judgment in favor of appellees. This appeal followed.

### STANDARD OF REVIEW

[¶ 11] Our standard of review in summary judgment cases is well established.

> Summary judgment motions are determined under the following language from W.R.C.P. 56(c):
>
> > The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
>
> The purpose of summary judgment is to dispose of suits before trial that present no genuine issue of material fact. *Moore v. Kiljander*, 604 P.2d 204, 207 (Wyo. 1979). Summary judgment is a drastic remedy designed to pierce the formal allegations and reach the merits of the controversy, but only where no genuine issue

of material fact is present. *Weaver v. Blue Cross–Blue Shield of Wyoming*, 609 P.2d 984, 986 (Wyo.1980). A fact is material if proof of that fact would have the effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties. *Schuler v. Community First Nat. Bank*, 999 P.2d 1303, 1304 (Wyo.2000). The summary judgment movant has the initial burden of establishing by admissible evidence a prima facie case; once this is accomplished, the burden shifts and the opposing party must present specific facts showing that there is a genuine issue of material fact. *Boehm v. Cody Country Chamber of Commerce*, 748 P.2d 704, 710 (Wyo.1987); *Gennings v. First Nat. Bank of Thermopolis*, 654 P.2d 154, 156 (Wyo. 1982).

> This Court reviews a summary judgment in the same light as the district court, using the same materials and following the same standards. *Unicorn Drilling, Inc. v. Heart Mountain Irr. Dist.*, 3 P.3d 857, 860 (Wyo.2000) (quoting *Gray v. Norwest Bank Wyoming, N.A.*, 984 P.2d 1088, 1091 (Wyo.1999)). The record is reviewed, however, from the vantage point most favorable to the party who opposed the motion, and this Court will give that party the benefit of all favorable inferences that may fairly be drawn from the record. *Garcia v. Lawson*, 928 P.2d 1164, 1166 (Wyo.1996).

*McGee v. Caballo Coal Co.*, 2003 WY 68, ¶ 6, 69 P.3d 908, ¶ 6 (Wyo.2003) (quoting *Garnett v. Coyle*, 2001 WY 94, ¶¶ 3–5, 33 P.3d 114, ¶¶ 3–5 (Wyo.2001)). We also recognized in *Mize v. North Big Horn Hosp. Dist.*, 931 P.2d 229, 232 (Wyo.1997) that little mystery remains concerning our willingness to dispose of cases via summary judgment, provided there is no genuine issue of material fact and the law clearly entitles the party to prevail.

### DISCUSSION

#### *Res Judicata/Collateral Estoppel/Judicial Estoppel*

[¶ 12] Initially, the Marksteins state that the district court disregarded the bank-

ruptcy court order authorizing the sale of the property and the order approving the Stipulation Re License Claims. According to the Marksteins, these court orders established the terms and conditions of the Crescent H Ranch purchase and that Thornton and his successors purchased the ranch subject to the granted fishing and club use rights. Thus, the Marksteins assert that the bankruptcy court orders have the effect of a final judgment regarding the validity of the fishing and club use rights. The Marksteins also contend that the district court erred in not finding that Thornton and his successors had breached the Stipulation Re License Claims.

[¶ 13] In replying to these arguments, appellees claim that the decision of the bankruptcy court to dismiss the avoidance action did not resolve the validity of the fishing and club use rights. Rather, the bankruptcy court simply dismissed this proceeding, finding that it was not justiciable. Thus, appellees conclude this order does not constitute a decision on the merits and, although Thornton and Countryside, L.L.C. may have agreed to be bound by the decision of the bankruptcy court concerning the fishing and club use rights involved in the avoidance action, the bankruptcy court never reached a decision on this issue. Appellees also argue that the sale order entered by the bankruptcy court specifically provided that Countryside, L.L.C. purchased Crescent H Ranch free of any RMA obligations, and Countryside, L.L.C. never agreed to accept assignment of the rights asserted absent a bankruptcy court determination that the rights were enforceable.

[¶ 14] Upon our review of the bankruptcy court's order dismissing the adversary proceeding, we agree that such order did not resolve the validity or invalidity of the fishing and club use rights. That order discloses that the bankruptcy court recognized that the adversary complaint filed by the RMA bankruptcy trustee sought to avoid or set aside fishing and club use rights on the Crescent H Ranch, including those rights asserted by the Marksteins.[3] However, after acknowledging this fact, the bankruptcy court concluded that because the trustee had sold his avoidance powers along with the Crescent H Ranch to Thornton and his successors, there was no benefit to the bankruptcy estate in determining the claims asserted. The bankruptcy court stated:

> [The trustee] is exercising his avoidance powers to seek relief which will have no effect on the estate and which treats similarly situated lot owners differently. Yet, he has no cognizable interest in the outcome. Any ruling on the validity of the lot owners' rights will not control or alter the ultimate result, and will not change the circumstances of the parties.

Thus, the bankruptcy court concluded that resolution of this issue effectively disposed of the adversary complaint in its entirety.

[¶ 15] In *Amoco Prod. Co. v. Board of County Comm'rs*, 2002 WY 154, ¶ 12, 55 P.3d 1246, ¶ 12 (Wyo.2002) (quoting *Eklund v. PRI Environmental, Inc.*, 2001 WY 55, ¶¶ 15–20, 25 P.3d 511, ¶¶ 15–20 (Wyo.2001)), we recognized that res judicata and collateral estoppel are related but distinct concepts. We noted that res judicata bars the relitigation of previously litigated claims or causes of action and that four factors are examined to determine whether the doctrine of res judicata applies: (1) identity in parties; (2) identity in subject matter; (3) the issues are the same and relate to the subject matter; and (4) the capacities of the persons are identical in reference to both the subject matter and the issues between them. Collateral estoppel bars relitigation of previously litigated issues and involves an analysis of four similar factors: (1) whether the issue decided in the prior adjudication was identical with the issue presented in the present action; (2) whether the prior adjudication resulted in a judgment on the merits; (3) whether the party against whom collateral estoppel is asserted was a party or in privity with a party to the prior adjudication; and (4) whether the party against whom collateral estoppel is asserted had a full and fair

---

3. The trustee for the RMA bankruptcy estate asserted that the fishing agreements were avoidable because they were either never recorded or recorded after the bankruptcy was filed and therefore void as a violation of the automatic stay order. The trustee also asserted that the fishing agreements could be set aside given the trustee's alleged status as a bona fide purchaser.

opportunity to litigate the issue in the prior proceeding.

■ [¶ 16] As in both *Amoco* and *Eklund,* the doctrine of res judicata is inapplicable to the bankruptcy court's order because res judicata applies to claims or causes of action. The adjudication of the adversary complaint by the bankruptcy court involved a claim asserted by the RMA bankruptcy trustee against the Marksteins and others, while this action concerns a claim by the Marksteins against Thornton and his successors. While the two involve the same fishing and club use rights and the Crescent H Ranch, they are separate and distinct claims. In addition, we conclude that the doctrine of collateral estoppel cannot be applied in this instance because the bankruptcy court did not make a determination on the merits of the adversary complaint.

■ [¶ 17] However, we reach a different conclusion than the district court upon our review of the other relevant documents involved in both the RMA bankruptcy and this action. Looking first at the purchase agreement entered into by the trustee of the RMA bankruptcy estate and Thornton concerning the sale of the Crescent H Ranch, it discloses that the transaction clearly included the sale of the trustees' avoidance powers. The purchase agreement provides for this transfer by stating that the transfer would include:

> 1.1.6 Avoidance Powers. All rights and power of the Trustee, whether under state law or the Bankruptcy Code (including, but not limited to, Sections 544 through 553 of the Bankruptcy Code), to set aside or avoid any interest in the Property.

That document also goes on to define permitted exceptions regarding title as follows:

> 3.1 Title: Permitted Exceptions. The Debtor shall transfer all of its right, title and interest in the Property free and clear of all liens, claims and encumbrances pursuant to (a) section 363(f) of the Bankruptcy Code or (b) a confirmed plan of reorganization, subject to the exceptions, restrictions, liens and encumbrances as may be agreed upon by the parties following delivery of the Title Commitment referred

to in Section 3.2, which shall then be attached hereto as *Exhibit 3.1* (the "Permitted Exceptions").

[¶ 18] Exhibit 3.1 to the purchase agreement provides, in pertinent part, that the fishing and use licenses could constitute permitted exceptions specifying:

#### Fishing Licenses

> 30. Fishing licenses, use agreements, or other rights to use or possess the Property which cannot be set aside or avoided by the Debtor under federal bankruptcy law, applicable state law, or rejected as executory contracts under federal bankruptcy law.

[¶ 19] Therefore, the purchase agreement unambiguously expresses Thornton's agreement to abide by the fishing and club use licenses issued involving the Crescent H Ranch that were not set aside, avoided, or rejected by the RMA bankruptcy trustee. This intention is also further enunciated in the Stipulation Re License Claims entered into between the trustee of the RMA bankruptcy, Countryside, L.L.C., as the successor in interest of Thornton, the Marksteins, and Jon M. and Arlene M. Malinski, who also asserted fishing and club rights concerning the Crescent H Ranch. This document clarifies that:

> 1. The sale of the Rivermeadows property by the Trustee to Countryside or any other buyer shall be made subject to, and not free and clear of, the License Claimants' rights and entitlements with respect to their five fishing license and use agreement claims.
>
> 2. Notwithstanding paragraph 1 above, *the License Claimants' fishing license and use agreement rights and entitlements shall be subject to the claims asserted by the Trustee in the [adversary] Complaint.*

(Emphasis added.) This stipulation was approved by the bankruptcy court.

[¶ 20] The order entered by the bankruptcy court authorizing the sale of Crescent H Ranch directed that the sale *"shall not be free and clear of the interests of those fishing license and use agreement holders*

*identified in the Sale Motion."* In addition, the bankruptcy court ordered that:

> Upon the Closing (as defined in the Purchase Agreement) title to the Property shall vest in Countryside or its assignees free and clear of all such liens, interests, claims, claims of co-ownership or community property, security interests, encumbrances, charges, liabilities, rights of parties to pending litigation relating to or arising in connection with the Property, prior assignments or interests of any kind, nature or description whatsoever *(but not the interests of those fishing license and use agreement holders identified in the Sale Motion).*[4]

(Emphasis added.) The order also particularly provided that: "The provisions of the Purchase Agreement and this Order shall be binding upon and inure to the benefit of the parties to the Purchase Agreement and their respective successors and assigns."

[¶ 21] Finally, a reading of the Plan of Reorganization evidences that the trustee carved out an exception from the general "rejection" provision found at § 9.01 of the proposed plan with respect to fishing and club use agreements. Section 9.03 of the Plan of Reorganization states:

> 9.03 *Exclusion of Fishing License, Club Amenity, and Similar Agreements.* Nothing contained in Section 9.01 of the Plan shall be interpreted or construed as affecting or otherwise altering any rights, duties, and obligations arising out of, or in connection with, any prepetition fishing license, club amenity, club use, or other agreement that granted (a) fishing and access rights to the riparian lands formerly owned and occupied by the Debtor, and/or (b) rights of access to, and to the use of, the riparian lands and the amenities connected with the real property commonly known as the Crescent H Guest Ranch and formerly owned and occupied by the Debtor, including, without limitation, those rights, duties, and obligations arising out of any agreements under which ... Ken-

neth W. Markstein and Carole Markstein ... claim to have fishing, riparian use, and/or guest service rights to the real property that was conveyed and transferred to Countryside pursuant to the Countryside Sale Order.

Section 9.03 goes on to explicitly state that the fishing license and club use agreements were not to be treated as executory contracts by providing:

> The Plan does not classify or treat any fishing license, club amenity, club use, or other similar types of agreements as executory contracts and expressly disclaims any characterization of any such licenses or agreements as executory contracts.

The bankruptcy court later confirmed the Plan of Reorganization.

[¶ 22] The immediately-referenced documents establish that Thornton and his successor Countryside, L.L.C. entities purchased Crescent H Ranch subject to the fishing and club use rights unless set aside, avoided, or rejected by RMA in its bankruptcy. RMA never set aside, avoided, or rejected the fishing and club use rights possessed by the Marksteins. The fact that RMA never set aside, avoided, or rejected the fishing and club use rights possessed by the Marksteins demonstrate that the bankruptcy proceedings simply preserved the status quo and support the application of both the doctrines of res judicata and collateral estoppel.

[¶ 23] As we noted in *Amoco,* at ¶ 12 (quoting *Eklund* ) the application of res judicata to those situations where a plaintiff attempts to bring the same claim in a subsequent action against the same or different defendants has a logical basis: It encourages resolution of the plaintiff's claims in a single action, and *it forces parties to abide by their agreements.* It is also logical that this same rule of law be followed in a circumstance such as this, where Thornton and his successors specifically agreed that they would honor the fishing and club use rights concerning the purchase of the Crescent H Ranch that were not set aside, avoided, or

---

4. Fishing and club use rights, including those asserted by the Marksteins, were specifically designated in the motion seeking approval by the bankruptcy court of the proposed purchase of the Crescent H Ranch. This motion also indicated that the transfer of the Crescent H Ranch would be subject to these rights unless avoided.

rejected by RMA. RMA never formally set aside, avoided, or rejected the fishing and club use rights held by the Marksteins. Notwithstanding, Countryside I, L.L.C. sent a letter to the Marksteins disavowing their fishing and club use rights, in essence forcing the Marksteins' to file this action seeking to enforce their fishing and club use rights.

[¶ 24] In further discussing the *Eklund* decision in our *Amoco* opinion, we also identified that such positioning by a party is inherently unfair. Specifically, we acknowledged with approval those cases cited by *Eklund* that set forth authority for the application of the doctrine of res judicata to consent judgments and settlements. *See Jefferson v. Greater Anchorage Area Borough*, 451 P.2d 730 (Alaska 1969); *Clark v. Haas Group, Inc.*, 953 F.2d 1235 (10th Cir.1992); and *In re Laing*, 31 F.3d 1050 (10th Cir.1994). *Amoco*, at ¶ 12. The actions taken by Thornton and his successors demand the same result.

[¶ 25] We even went further in our analysis in *Amoco*, at ¶ 12, to address the effect of collateral estoppel on settlements or consent judgments. Therein, we established that normally issue preclusion (collateral estoppel) does not attach unless it is clearly shown that the parties intended that the issue be foreclosed in other litigation and that, in most circumstances, it is recognized that consent agreements are usually intended to preclude any further litigation on the claim presented (res judicata) but are not intended to preclude further litigation on any of the issues presented (collateral estoppel). Hence, we determined that consent judgments will ordinarily support claim preclusion (res judicata) but not issue preclusion (collateral estoppel). Nevertheless, we recognized an exception to the general rule that the doctrine of collateral estoppel should be applied when settlement agreements that clearly express the intention of the parties to be bound in further proceedings are involved. *Amoco*, at ¶ 12 (citing 18 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction*

§ 4443, at 382–85 (1981); *Linder v. Missoula County*, 251 Mont. 292, 824 P.2d 1004, 1006–07 (1992); and *Hofsommer v. Hofsommer Excavating, Inc.*, 488 N.W.2d 380, 385 (N.D. 1992)).

[¶ 26] Here, the exception to the general rule must be applied. Thornton and his successors in interest agreed to be bound by the fishing and club use rights granted the Marksteins with respect to the purchase of the Crescent H Ranch if they were not set aside, avoided, or rejected by RMA. RMA never formally set aside, avoided, or rejected the fishing and club use rights held by the Marksteins.

[¶ 27] We identified in *Amoco*, at ¶ 17, that the application of the doctrine of judicial estoppel requires a similar result.

In *Cross v. Berg Lumber Co.*, 7 P.3d 922, 930 (Wyo.2000) (citing *Allen v. Allen*, 550 P.2d 1137, 1142 (Wyo.1976)), we stated that judicial estoppel is sometimes referred to as a doctrine which estops a party to play fast and loose with the courts or to trifle with judicial proceedings. It is an expression of the maxim that one cannot blow hot and cold in the same breath. A party will just not be allowed to maintain inconsistent positions in judicial proceedings. Further, we enunciated that judicial estoppel requires that "where a man is successful in the position taken in the first proceeding, then that position rises to the dignity of conclusiveness." *Cross*, at 930 (citing *Erhart v. Flint Engineering & Const.*, 939 P.2d 718, 724 (Wyo.1997); *Hatten Realty Co. v. Baylies*, 42 Wyo. 69, 290 P. 561, 566 (1930)).

[¶ 28] Again, the undisputed evidence establishes that Thornton and his successors agreed to be obligated by the fishing and club use rights granted to the Marksteins with respect to the purchase of the Crescent H Ranch unless these rights were set aside, avoided, or rejected by RMA. Yet, RMA never formally set aside, avoided, or rejected those rights held by the Marksteins.[5]

---

5. As an aside, the Marksteins also assert that the district court erred in finding that appellees are entitled to protection under the Wyoming Recording Act because each of the appellees had notice of the fishing and club use rights. Clearly, appellees each had notice of the fishing and club

*Easement/License*

[¶ 29] The Marksteins contend that the district court improperly concluded that the fishing and club use agreements constituted licenses, not easements. Rather, the Marksteins argue that the fishing license and club use agreements created an interest in real property that ran with the land, not revocable licenses that were terminated upon the purchase of the land. In particular, they complain that the district court's ruling belies the plain language of the agreements concerning the fishing and club use rights making it clear that these rights were perpetual and could not be terminated upon transfer of the Crescent H Ranch.

A license is a privilege to do certain acts of a temporary character on the land of another which is revocable at the will of a licensor unless a definite time has been specified, or unless it is coupled with an interest. *Coumas v. Transcontinental Garage,* 68 Wyo. 99, 230 P.2d 748, 758 (1951). A license does not give any interest in the land, but means that one who possesses a license is not a trespasser. *Anthony Wilkinson Live Stock Co. v. McIlquam,* 14 Wyo. 209, 226–27, 83 P. 364, 369 (1905); *Metcalf v. Hart,* 3 Wyo. 513, 527, 27 P. 900, 905 (1891). A license may be created by parol, a writing, or can be implied from the acts of the parties, from their relations, and from usage and custom. *Kendrick v. Healy,* 27 Wyo. 123, 148, 192 P. 601, 610 (1920). Usually, an implied license is terminable at will. *See Coach House Restaurant, Inc. v. Coach and Six Restaurants, Inc.,* 934 F.2d 1551, 1563 (11th Cir.1991); *cf. Sarfaty v. Evangelist,* 142 A.D.2d 995, 530 N.Y.S.2d 417, 418 (4 Dept.1988) (unless the conduct of the licensor makes it inequitable to permit licensor to revoke license).

*Sammons v. American Auto. Ass'n,* 912 P.2d 1103, 1105–06 (Wyo.1996).

use rights granted the Marksteins, as they agreed to abide by them upon purchase of the subject property from the bankruptcy estate unless formally set aside, avoided, or rejected by the trustee in the RMA bankruptcy.

In addition, while the RMA bankruptcy trustee became a bona fide purchaser on the date of the filing of the petition for that bankruptcy with respect to those rights that were not formally a matter of record as of that date, the trustee

[¶ 30] We also stated in *Baker v. Pike,* 2002 WY 34, ¶ 11, 41 P.3d 537, ¶ 11 (Wyo. 2002):

Generally, an easement is a "nonpossessory interest in land of another." Jon W. Bruce and James W. Ely, Jr., *The Law of Easements and Licenses in Land* § 1:1 (2001) (hereinafter Bruce and Ely). An easement grants the holder the right to a limited use or enjoyment over another's property. *Mueller v. Hoblyn,* 887 P.2d 500, 504 (Wyo.1994). An easement differs from a license in that a license generally grants permission to do something on another's property. Bruce and Ely at § 1:4. Since permission to do something can be easily rescinded, the landowner usually can terminate the license. *Id.* Alternatively, easements are generally irrevocable interests in land. *Id.*

[¶ 31] In *Hasvold v. Park County School Dist. No. 6,* 2002 WY 65, ¶ 13, 45 P.3d 635, ¶ 13 (Wyo.2002), we also recognized:

An easement is defined as "an interest in land which entitles the easement holder to a limited use or enjoyment over another person's property." *Mueller v. Hoblyn,* 887 P.2d 500, 504 (Wyo.1994); *Restatement of Property* § 450(a) (1944). In construing an easement, we seek to determine the intent of the parties to the easement. *R.C.R., Inc. v. Rainbow Canyon, Inc.,* 978 P.2d 581, 586 (Wyo.1999). *See also Restatement Third, Property* (Servitudes) § 4.1 (2000). We begin by attempting to glean the meaning of the easement from its language. *R.C.R., Inc.,* 978 P.2d at 586; *Steil v. Smith,* 901 P.2d 395, 396 (Wyo. 1995). If the language of the easement is clear and unambiguous, we interpret the easement as a matter of law, without resorting to the use of extrinsic evidence to determine the parties' intent. *Id.* If, how-

essentially waived his right to claim the benefit of bona fide purchaser status when he sold the property subject to the fishing and club use rights. Further, Thornton and the Countryside, L.L.C. entities similarly waived any rights they had to claim the benefit of the trustee's bona fide purchaser status by agreeing to take title to the property subject to the fishing and club use rights.

ever, the language is ambiguous, then the court looks to extrinsic evidence to ascertain the parties' intent. *R.C.R., Inc.*, 978 P.2d at 586; *Edgcomb v. Lower Valley Power and Light, Inc.*, 922 P.2d 850, 855 (Wyo.1996).

Later, in *Baker v. Pike*, ¶ 20, we stated:

In determining whether an easement or a license exists, the critical factor to consider is the parties' intent, identified by the manner in which the right was created, the nature of the right created, the duration of the right, the amount of consideration given for the right, and whether there is a reservation of power to revoke the right. Bruce and Ely, *supra*, at § 1:5.

In addition, in *Rehnberg v. Hirshberg*, 2003 WY 21, ¶ 9, 64 P.3d 115, ¶ 9 (Wyo.2003) (quoting *Sowerwine v. Keith*, 997 P.2d 1018, 1020 (Wyo.2000)), a case wherein we recently were called to review a real estate contract deed which involved fishing rights, we elaborated that:

Our rules of contract construction are well known. First, we do not need to construe contracts that are not ambiguous. *Evans v. Farmers Ins. Exchange*, 2001 WY 110, ¶ 9, 34 P.3d 284, 286 (Wyo.2001).

Whether a contract is ambiguous is a question of law. *O'Quinn Enterprises [v. Central Wyoming Regional Water System Joint Powers Board]*, 975 P.2d [1062], 1064 [ (Wyo.1999) ]. When deciding whether a contract is ambiguous, we endeavor to determine the intention of the parties. *Wolter [v. Equitable Resources Energy Company, Western Region]*, 979 P.2d [948], 951 [ (Wyo.1999) ]. An ambiguity exists when a contract's language conveys an obscure or double meaning. *Kirkwood v. CUNA Mutual Insurance Society*, 937 P.2d 206, 208 (Wyo.1997). When contract provisions are not ambiguous or uncertain, the document speaks for itself. 937 P.2d at 209. With an unambiguous agreement, we secure the parties' intent from the words of the agreement as they are expressed within the four corners of the document. *Wolter*, 979 P.2d at 951. All conversa-

tions, contemporaneous negotiations, and parol agreements between the parties that occurred prior to the written agreement are merged into the written agreement. *O'Quinn Enterprises*, 975 P.2d at 1064. We turn to extrinsic evidence and rules of contract construction only when the contract language is ambiguous and its meaning is doubtful or uncertain. *Wolter*, 979 P.2d at 951.

### *Fishing Rights*

[¶ 32] Upon our review of the fishing license agreement at issue, we conclude, as did the district court, that it is unambiguous as a matter of law.[6] However, we disagree with the determination of the district court that this document creates only a revocable license. Initially, we note that in making its ruling the district court partially relied on the fact that the parties within the agreement are referred to as "licensor" and "licensee." We further recognize that the title to the document utilizes the wording "Fishing License Agreement." "The label that the parties give the right, however, does not dictate its legal effect." Jon W. Bruce and James W. Ely, Jr., *The Law of Easements and Licenses in Land*, at § 1:5 (2001). Also, the title to an instrument is not controlling in determining whether the right conferred is a license or an easement; the intent of the parties to the agreement is controlling. 25 Am.Jur.2d *Easements and Licenses*, §§ 3 and 137 (1996). In addition, § 14 of the agreement expressly states that the headings used within the agreement are for convenience only and are not to be utilized in construction of the document.

[¶ 33] The plain language used within the agreement supports the conclusion that the fishing rights involved run with the land and do not merely constitute revocable license rights. In attempting to discern the parties' intent, 1) identified by the manner in which the right was created, 2) the nature of the right created, 3) the duration of the right, 4) the amount of consideration given for the right, and 5) whether there is a reservation of power to revoke the right as we are re-

---

**6.** Only one such agreement appears in the record. The license agreement involving Parcel 2 is verbatim in substance and form to the agreement regarding Parcel 1.

quired, we can reach no other resolution but that these rights run with the land. *See Baker v. Pike,* at ¶ 20.

[¶ 34] The agreement clearly expresses at § 1 that the rights given are granted in consideration for the purchase of land, whether it be the purchase of Parcel 1 or Parcel 2 of the Fish Creek Meadows Property. In addition, terms of the Parcel 1 purchase provide that if Parcel 1 was split, duplicate fishing and club rights would immediately issue with that newly split parcel. Section 3 of the agreement also specifies that the rights extended are given as an accommodation and shall be rent free; the only consideration given in return for such rights is the mutual obligations and acknowledgments expressed within the agreement. Obviously, the obligations referred to are those explicitly referenced within the agreement wherein the Marksteins promise to abide by the various terms identified within the agreement *along with their ownership of the specified real property.* The intention that the rights designated run with the land is further confirmed by the fact that the agreement expresses that these rights are not assignable in whole, or in part, except to any successor *owner* of the particular real estate (i.e., either Parcel 1 or Parcel 2). These successors are each classified as a "member" in good standing of the Fish Creek Meadows Homeowner's Association, Inc., generally defined as *owners* of real property within the association who are in compliance with the declared covenants, conditions, and restrictions, and such successors do not exceed the original number of *owners* originally granted the rights defined. In tandem with this idea, the "licensee" expressly acknowledges title of the licensor to the premises in the agreement and agrees never to assail, resist, or deny such title. Likewise, it is stated within the agreement that "[n]o greater fishing rights shall be granted to any other Licensee *as purchaser of a lot* than those granted to Licensee hereunder."

[¶ 35] Verbiage within the agreement details that the rights involved are to be used within a certain portion of the servient estate. In particular, the fishing rights are to be utilized within a legally described area of land with the specific legal description of this land attached as an exhibit to the agreement. Two separate sketch maps are also incorporated and attached to the agreement to further denote the applicable area of land involved. The fact that the agreement states that the agreement shall not be recorded is also not determinative, as the parties are allowed to execute and record a memorandum of the agreement.

[¶ 36] Duration of the rights granted is also expressly stated within the agreement. The agreement at § 9 provides:

> This License Agreement shall be ***perpetual unless terminated as herein provided.*** The term of this License Agreement and the ownership of Parcel 1, notwithstanding, the Licensor may, at his election, unilaterally terminate this Agreement upon twenty (20) days written notice and failure to correct within that time, if Licensee or any successor licensee shall fail to: (a) comply with or abide by each and all of the provisions hereof; (b) keep all and singular Licensee's promises herein; (c) remain a "member" in good standing (as a "member" is defined in the Declaration of Covenants, Conditions and Restrictions for Fish Creek Meadows) of the Fish Creek Meadows Homeowner's Association, Inc., subject to Licensee's right to assign their interest herein to successive owners of Parcel 1 and provided that if notice of breach of the conditions is given three (3) times in any 12–month period then upon the fourth breach in such period this License may be terminated immediately without further notice[.]

(Emphasis added.) The parties clearly intended that the rights granted would be granted permanently unless the Marksteins or their successors failed to abide by the terms of the agreement as defined.[7] Moreover, while the agreement allows for the "unilateral" termination of the agreement by the "licensor," the right to terminate the agreement may not be exercised in an unfet-

---

7. No allegation has been made that the Marksteins breached the agreement so as to allow the termination of those rights provided within the agreement.

tered and unrestricted manner. Rather, termination may be effectuated only upon the occurrence of the specified events. This intention is further expressed in both the memoranda signed by the parties involving the agreements concerning both Parcel 1 and Parcel 2, which state "Licensor has reserved and does reserve the right to terminate the License Agreement in accordance with its terms for failure on the part of the Licensee to perform its obligations."

[¶ 37] The permanency of the rights granted is also implied within additional language contained in § 9 of the agreement which details that if the "licensor" provides substantially identical fly fishing opportunities through the establishment of The Lodge Club at the Crescent H Ranch or a similar club through the homeowner's association, the license shall be deemed to be suspended. In addition, should the Club or other entity be subsequently dissolved, the fishing rights shall be reinstated.

[¶ 38] Similarly, although appellees argue that only a license is inferred because they are entitled to specify the access point for exercise of the fishing rights, the means of access via foot travel, the parking of vehicles with respect to such access, the type of fishing allowed, and they may restrict fishing by the licensees and their guests under certain conditions, such powers are limited. These limitations may only be enforced upon good faith consideration of the surrounding circumstances and, in the latter case, space availability and within "specific times of the day or week in order to avoid overcrowding of the fishing habitats." Likewise, while an assignment of the fishing rights must be performed in writing, with the successive owners agreeing to be bound by each of the terms of the agreement and the "licensor" must first approve the form of any assignment agreement, the "licensor" must assert such right "in good faith" and cannot unreasonably withhold its approval.

[¶ 39] The Marksteins paid substantial consideration, having paid the sum of $1,450,000.00 for Parcel 1 and approximately $1,600,000.00 for Parcel 2. This court noted in *Masinter v. Markstein*, 2002 WY 64, fn. 4, 45 P.3d 237, fn. 4 (Wyo.2002), that there was

evidence that the fishing rights added at least $125,000.00 in value to each parcel within the subdivision. Mr. Markstein testified in his deposition that Mr. Thornton wanted $600,000.00 to grant similar fishing and club use rights when he attempted to negotiate for these rights previously. "Substantial consideration indicates an easement." Bruce and Ely, at § 1:5 and those cases cited therein.

[¶ 40] Last, we recognize that an express reservation of the power to cancel, revoke, or terminate the right may indicate a license. However, the power to terminate in the landowner does not necessarily mean that a license was created. Specifying a power to terminate for a particular reason or in limited circumstances may be seen as inconsistent with the unabridged right to revoke retained by one who grants a license. An easement may also be expressly subject to termination by the servient owner upon the occurrence of a specified event. *Id.*

[¶ 41] As indicated previously, the parties expressed that the rights granted would be permanent in nature unless the Marksteins or their successors failed to abide by the terms of the agreement as defined. Thus, those rights of termination or revocation may not be exerted at will. Additionally, the "licensor" reserved "all rights of ownership, including but not limited to the right to use or allow others to use the premises for fishing or any other purpose, and the right to mortgage, sell or otherwise encumber or dispose of the premises and to construct buildings, structures or otherwise make improvements to the premises." However, these reserved rights are specifically "subject to the rights" of the "licensee" expressed within the agreement.

[¶ 42] Finally, the agreement states that the "licensor" "specifically reserves the right to transfer his rights and obligations ... to his successor or assigns, by devise or under an instrument specifically designating such successor or assigns as a successor or assign" and that "*any new successor or assign will be subject to and receive the benefits of the terms and conditions contained herein.*" (Emphasis added.) Critically, the

agreement also explicitly states that *"[i]t is mutually agreed that all of the covenants and agreements herein contained shall extend to and be obligatory upon the successors and permitted assigns of the respective parties."* The agreement goes on to provide that it may not be changed orally, but only in writing signed by the party against whom enforcement of any waiver, change, modification, or discharge is sought. This language clearly expresses the intent of the parties that the rights delineated would be continual.

[¶ 43] Accordingly, we hold that the rights granted pursuant to the fishing license agreements constitute an easement running with the land. As we stated in *Baker v. Pike*, at ¶ 12: "An easement is appurtenant 'when the easement is created to benefit and does benefit the possessor of land in his use of the land.' This means that the easement must be created to benefit the owner of the easement as a possessor of a particular parcel of land." (Citations omitted.) Such is the case here.

[¶ 44] In addition, appellees assert that even assuming that the agreements are easements, they are void under Wyo. Stat. Ann. § 34–1–141 (LexisNexis 2003) because they do not sufficiently describe the location of the alleged easement. Section 34–1–141 provides:

(a) Except as provided in subsection (c) of this section, easements across land executed and recorded after the effective date of this act which do not specifically describe the location of the easement are null and void and of no force and effect.

. . .

(c) For purposes of this act [section] an easement or agreement which does not specifically describe the location of the easement or which grants a right to locate an easement at a later date shall be valid for a period of one (1) year from the date of execution of the easement or agreement. If the specific description is not recorded within one (1) year then the easement or

agreement shall be of no further force and effect.

(d) For purposes of this act [section] the specific description required in an easement shall be sufficient to locate the easement and is not limited to a survey.

[¶ 45] As indicated previously, language within the agreement provides that the rights involved are to be used within a particular region of the servient estate and includes a specific legal description of this land attached as an exhibit to the agreement. In addition, two separate sketch maps are also incorporated and attached to the agreement to further denote the applicable area of land involved. This description and demarcation is adequate to meet the requirements set forth by Wyo. Stat. Ann. § 34–1–141.

### Club Use Rights

[¶ 46] When the Marksteins purchased both Parcels 1 and 2 of the Fish Creek Meadows Property, they were also granted certain club use rights regarding the "Crescent H Ranch amenities and facilities in customary and usual form offered to all Crescent H Homeowners" apparently in the form of an "Interim Club Agreement".[8] Upon our review of the language utilized in the club use agreement, we again determine that the agreement is not ambiguous, but conclude that this agreement must be designated a revocable license.

[¶ 47] While it is true that the agreement creates the rights indicated by virtue of the purchase and ownership of specifically delineated land, contrary to the fishing rights agreements, this document specifies that participation in horseback rides and utilization of the cross-country ski trails and the dining facilities are limited. Indeed, it is stated within the agreement that during "certain brief periods throughout the summer certain groups or corporations" may reserve the Crescent H Ranch "for their exclusive use, during which time it may not be possible to schedule a horseback ride" and that reservations for horseback rides must be made a day in advance. These rights may also only be

---

8. The Interim Club Agreement by its terms was to remain in affect only until more formal "Club" documents were completed. However, the more formal "Club" documents were evidently never finalized.

exercised during the normal Crescent H Ranch summer season and usual riding hours. Dining privileges are extended solely during the summer and winter seasons of operation, on a "reasonable 'as available' basis, with twenty-four hours notice."[9] The club use agreement also states that the cross-country ski trails may be used each winter ski season only in those areas designated each year by the licensor and that any of the rights granted are subject to regulations and policies set solely by the licensor. These granted rights are further only "transferable" to subsequent owners of the land.

[¶ 48] Additionally, the agreement requires that an annual fee to enjoy these rights of use be paid in the amount of $1,000.00 and that this amount may be adjusted in the future on a reasonable basis. Separate fees for breakfast, lunch, dinner, and barbecues shall also be set each year by the licensor on a reasonable basis. The licensor also reserved the right to impose regulations and policies that must be followed as a condition of continued enjoyment of the various rights of use. No duration of the rights granted is expressed within the agreement, but no reservation of the power to revoke such rights is maintained.

[¶ 49] Upon review of each of the expressed terms and surrounding circumstances, we hold that the language utilized by the parties in the club use agreement evidences the intent of the parties to grant the rights inferred on a terminable basis and not in perpetuity. As such, we classify the club use agreement as a revocable license. Simply put, this agreement granted rights that were temporary in nature and could be unilaterally revoked at the will of the licensor.

## CONCLUSION

[¶ 50] We hold that the district court improperly determined that summary judgment should be granted in favor of appellees with respect to the fishing rights granted the Marksteins. To the contrary, the record before us presents no material issues of fact, and the Marksteins were entitled to summary judgment as a matter of law on this

issue. Thornton and his successors in interest agreed to be bound by the fishing rights granted the Marksteins with respect to the purchase of the Crescent H Ranch if they were not set aside, avoided, or rejected by RMA. RMA never formally set aside, avoided, or rejected the fishing and club use rights held by the Marksteins. In addition, the fishing agreements constitute valid appurtenant easements.

[¶ 51] We affirm the district court's ruling that the club use agreements constituted revocable licenses and that appellees should be granted summary judgment in such regard. While Thornton and his successors in interest agreed to be bound by the club use rights granted the Marksteins with respect to the purchase of the Crescent H Ranch if they were not set aside, avoided, or rejected by RMA and RMA never formally set aside, avoided, or rejected these club use rights, the club use agreement rights were revocable at will and were properly revoked.

[¶ 52] Accordingly, the Marksteins should have been granted summary judgment concerning their second claim for quiet title regarding only the fishing rights granted, the third claim for declaratory relief concerning the subject fishing rights, the fourth claim requesting restoration of the lost or destroyed Parcel 2 Fishing License Agreement, and the eleventh claim for breach of the Stipulation re: License Claims again regarding solely the fishing rights issues. Appellees must be granted summary judgment on the second claim for quiet title with respect to the club use rights, fifth claim for declaratory relief on the club use rights, the seventh claim for breach of contract concerning the club use rights, the ninth claim of tortious interference with contract as it relates to the club use rights, and the eleventh claim for breach of the Stipulation re: License Claims relating to the club use rights.

[¶ 53] Therefore, the remaining causes of action that must still be adjudicated are those for damages stemming from the sixth claim for breach of contract concerning the fishing license agreements, the eighth claim

---

9. This agreement also refers to fishing rights in a general nature but then references the much

more specific Fishing License Agreement already discussed above.

for contractual attorneys fees, and the ninth claim for tortious interference with contract as it relates to the fishing license agreements.

[¶ 54] Affirmed, in part, reversed, in part, and remanded for further proceedings consistent with this opinion.