2007 WY 30

**James E. CORNELIUS, Appellant (Plaintiff),**

v.

**POWDER RIVER ENERGY CORPORATION, INC., a Wyoming corporation, acting through their agents, officers, employees and representatives, Appellee (Defendant).**

No. 06–186.

Supreme Court of Wyoming.

Feb. 21, 2007.

Rehearing Denied March 20, 2007.

Representing Appellant: C. John Cotton of Cotton Law Offices, Gillette, Wyoming; and Kenneth E. Barker of Barker Reynolds Law Firm, LLC, Belle Fourche, South Dakota. Argument by Messrs. Cotton and Barker.

Representing Appellee: Bruce A. Salzburg of Freudenthal, Salzburg & Bonds, P.C., Cheyenne, Wyoming.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] Cornelius sued his employer (Baldwin) and the company for which Baldwin did contract work (PRECorp) for injuries Cornelius suffered when he contacted a live electrical line. The district court granted summary judgment to PRECorp on two grounds: first, as the employer of an independent contractor, PRECorp was not vicariously liable for injuries to that contractor's employee; and second, PRECorp was not independently negligent. We affirm.

## ISSUES

[¶ 2] 1. Whether the district court erred in failing to determine whether the contract between Baldwin and PRECorp was written or oral?

2. Whether the district court erred in applying the wrong standard to determine whether Baldwin was an independent contractor?

3. Whether genuine issues of material fact exist as to whether Baldwin was an independent contractor?

4. Whether genuine issues of material fact exist as to PRECorp's liability for its own negligence?

## FACTS

[¶ 3] PRECorp is a rural electric cooperative serving the northeastern part of Wyoming. PRECorp was formed in 1997 by the merger of Tri–County Electric Association, Inc., and Sheridan–Johnson Rural Electrification Association. Baldwin, d/b/a Live Line Maintenance, provides construction and maintenance services to rural electric cooperatives in South Dakota, Nebraska, and Wyoming.

[¶ 4] In 1990, Tri–County decided that its workload was such that it could no longer perform systematic inspections or routine line maintenance. Beginning the following year, Tri–County (and later PRECorp) entered into a series of contracts with Baldwin, whereunder Baldwin provided a variety of services, including routine inspection and maintenance of power poles and live electrical lines. Baldwin's crews inspected power poles, tightening hardware, replacing broken insulators and lightning arrestors, and retying loose conductors where necessary.

[¶ 5] Baldwin's bids under the contracts were for work to be done on energized lines. The prices charged were set out in attachments to a series of contracts signed by the parties. The documents, themselves, were standard forms originally provided by the United States Department of Agriculture Rural Electrification Administration—later known as the Rural Utilities Services—and were designated as RUS Form 792, "Distribution Line Extension Construction Contract (Labor Only)."

[¶ 6] Cornelius began working for Baldwin as a lineman in 1996. He had done similar routine maintenance work for eleven or twelve years in Montana. From 1996 through 1999, Cornelius performed maintenance work on various rural electric cooperatives' power lines in Nebraska and South Dakota. Beginning in late 1999, he began working on PRECorp's power lines, doing the same type of work. Baldwin provided Cornelius a bucket truck, a pneumatic wrench, and insulated gloves and liners. Cornelius provided his own hand tools.

[¶ 7] During the last year or two of the period in which Baldwin's crews did work for PRECorp, Baldwin began to experience health problems and he stopped personally supervising his field crews. Subsequently, PRECorp began to notice deficiencies in the work done by those crews, some of which deficiencies raised safety questions, including crew training, the wearing of hard hats and safety glasses, and whether protective gear and bucket trucks had been tested. As a result of these concerns, PRECorp scheduled a meeting with Baldwin for February 21, 2002. At that meeting, Baldwin was given 30 days in which to correct the noted deficiencies and to provide to PRECorp written evidence that his equipment had been properly tested. When that evidence was not produced, Baldwin's contract was terminated.

[¶ 8] Unfortunately, Cornelius was injured during the hiatus between the meeting

and Baldwin's contract termination. On March 11, 2002, Cornelius was in the bucket of his truck tightening hardware on a PRECorp power pole with three energized lines. He had just removed his insulated gloves to tighten the hardware on the neutral connector when his head apparently contacted one of the live lines. The electric current entered his body near his left ear, followed pathways down both arms to the bucket, and then to the ground through the boom of the truck or through an uninsulated pneumatic hose. Cornelius sustained serious injuries.

## STANDARD OF REVIEW

[¶ 9] Summary judgments are governed by W.R.C.P. 56, with particular attention paid to the following language from subsection (c) thereof:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

[¶ 10] When summary judgment has been granted below,

> [t]his Court reviews a grant of summary judgment de novo without giving any deference to the district court's determinations. In reviewing a district court's grant of summary judgment, this Court has before it the same materials as the district court and it employs the same standards as used by the district court. We examine the record from the vantage point most favorable to the party who opposed the motion, and we give that party the benefit of all favorable inferences that may fairly be drawn from the record.

*Habco v. L & B Oilfield Serv.*, 2006 WY 91, ¶ 7, 138 P.3d 1162, 1164 (Wyo.2006). The movant has the initial burden of establishing a *prima facie* case by admissible evidence. If that is done, the burden then shifts to the opposing party to present specific facts showing that there remain genuine issues of material fact. *Markstein v. Countryside I,*

*L.L.C.,* 2003 WY 122, ¶ 11, 77 P.3d 389, 393 (Wyo.2003). A summary judgment granted in a negligence action is subject to more exacting scrutiny upon appeal because negligence actions "by their nature are factually dependent[.]" *Foote v. Simek,* 2006 WY 96, ¶ 9, 139 P.3d 455, 458 (Wyo.2006) (quoting *Franks v. Indep. Prod. Co.,* 2004 WY 97, ¶ 9, 96 P.3d 484, 489 (Wyo.2004)).

## DISCUSSION

### *Whether the district court erred in failing to determine whether the contract between Baldwin and PRECorp was written or oral?*

[¶ 11] In its decision letter, the district court included the following footnote: "Plaintiff and PRECorp dispute whether a written contract or an oral contract actually controlled the work of [Baldwin], but this dispute is not material to the court's decision." On its face, this footnote does make it appear that the district court never made a decision as to what contract created the relationship between the parties. When the decision letter is read in its entirety, however, it is clear that the district court found that the parties had entered into written contracts. For instance, in considering whether PRECorp asserted a controlling and pervasive role over Baldwin's operations, the district court declared that "[t]he written contract between [Baldwin] and PRECorp contains a provision stating that the contractor ([Baldwin]) will perform work in compliance with all applicable safety laws."

[¶ 12] A review of the record makes the opposite conclusion—that the parties operated under an oral contract—an evidentiary absurdity. Throughout the entire duration of their working relationship, PRECorp and Baldwin annually signed a form contract, to which was attached Baldwin's then-current fee schedule, called a "price list," for the work to be done. The fact that the parties used a form document that was not wholly suited to its purposes does not negate the fact that it was the parties' contract.[1] The

---

1. RUS Form 792 appears to have been designed as a contract for use in the construction of power distribution line extensions.

district court's facts and conclusions were based upon this contract, and we find no error in that regard.

### Whether the district court erred in applying the wrong standard to determine whether Baldwin was an independent contractor?

[¶ 13] The answer to this question is dependent upon the answer to the first question because the gist of Cornelius's argument here is that the district court looked to cases where there was an express written contract between the parties, rather than to cases where there was no express contract between the parties. We concluded above that the district court correctly had found that the parties operated under a series of annual written contracts. With that in mind, we now also conclude that the district court applied the appropriate rules of law in determining that Baldwin was an independent contractor. Rather than paraphrasing the district court's decision letter, we will set forth the relevant portion at length, inasmuch as it correctly states the law to be applied:

> In *Franks v. Independent Production Company*, the Wyoming Supreme Court defined an independent contractor as "one who, exercising an independent employment, contracts to do a piece of work according to his own methods and without being subject to the control of his employer except as to the result of the work." 2004 WY 97, ¶ 10, 96 P.3d 484 (Wyo.2004) (citing *Combined Ins. Co. of America v. Sinclair*, 584 P.2d 1034, 1043 (Wyo.1978) (quoting *Lichty v. Model Homes*, 66 Wyo. 347, 211 P.2d 958, 967 (Wyo.1949))). In order to determine whether a given contractor is functioning as an independent contractor or a servant, the Court has observed "[t]he overriding consideration in distinguishing between master-servant relationships and employer-independent contractor relationships is the employer's right to control the means and manner of the work." *Diamond B. Servs. v. Rohde*, 2005 WY 130, ¶ 28, 120 P.3d 1031, 1041 (Wyo.2005). The Court added: "[w]hen an

express contract exists between the parties, it is important evidence in defining the relationship, although it is not conclusive of the issue." *Id.* (citing *Coates v. Anderson*, 2004 WY 11, ¶ 14, 84 P.3d 953, 957 (Wyo.2004); *Noonan v. Texaco, Inc.*, 713 P.2d 160, 164 (Wyo.1986)).

As the Franks Court noted, "[g]enerally, the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants." *Franks*, ¶ 10 (citing *Hittel v. WOTCO, Inc.*, 996 P.2d 673, 676 (Wyo.2000) (citing Restatement (Second) of Torts ¶ 409 (1965); *Hill v. Pacific Power & Light Co.*, 765 P.2d 1348, 1349 (Wyo.1988))). Further, the Court has adopted the general rule that an employer of an independent contractor "is not obligated to protect the employees of an independent contractor from hazards which are incidental to, or part of, the very work the contractor was hired to perform." *Jones v. Chevron U.S.A.*, 718 P.2d 890, 894 (Wyo. 1986) (citations omitted).

The *Franks* court recognized that "[t]wo limited exceptions to non-liability have been recognized in our previous decisions: (1) workplace owner/employer (owner) exercises controlling and pervasive role over the independent contractor's work; or (2) owner assumes affirmative safety duties." *Franks*, ¶ 10 (citing *Hittel*, 996 P.2d at 676; *Jones v. Chevron*, 718 P.2d at 896). The United States Court of Appeals for the Tenth Circuit applied those exceptions and Wyoming law in the recent case of *Hjelle v. Mid–State Consultants, Inc.*, 394 F.3d 873 (10th Cir.2005). In *Hjelle*, the Court held that the owner in that case (acting through its agent) did not exercise a "controlling or pervasive role" over the independent contractor's work, even though "(1) [owner's agent] instructed Plaintiff where to dig and where to place the pipe and other items, but did not instruct Plaintiff on how to operate the backhoe; (2) he indicated that the work was completed according to specifications and the trench could be filled; (3) he instructed Plaintiff to mark the pipe in the bottom of the

trench with scare tape; and (4) he 'instructed [independent contractor] employees ... where to place the remote, pipe and other items ... and approved their work, but he did not direct the specific manner in which those results should be obtained.' " *Id.* at 879. The Court in that case concluded that the instructions given by the owner's agent were "incidental to and consistent with his role of ensuring that the final product of [independent contractor's] work complied with contract requirements." *Id.*

Finally, the Wyoming Supreme Court has held that electricity is an ultrahazardous instrumentality, and that businesses working with ultrahazardous instrumentalities owe a greater duty of care than the basic reasonable-under-all-the-circumstances standard. *Wyrulec Co. v. Schutt*, 866 P.2d 756, 761 (Wyo.1993). In situations where an ultrahazardous instrumentality as electricity is in use, the Court has further acknowledged that "the duty of the electric company to maintain safe premises is nondelegable." *Ruhs v. Pacific Power & Light*, 671 F.2d 1268 (10th Cir.1982).

[¶ 14] When this law is applied to the facts of this case, it is clear that Baldwin was an independent contractor and that summary judgment in favor of PRECorp was appropriate on that issue. Certain overriding facts are not contradicted. Baldwin contracted with PRECorp to do piecework at specified fees. In general, it can be said that PRECorp hired Baldwin to obtain a particular result—Baldwin would inspect power poles and tighten loose hardware. Baldwin provided the men, equipment, and supervision. PRECorp did not retain anything approaching a "controlling or pervasive role" in the work. PRECorp's role was (1) to specify where the work was to be done; and (2) to pay for the work that was done.

[¶ 15] There is no suggestion in the record either that PRECorp provided unsafe premises, or that PRECorp took over affirmative safety duties. PRECorp's "premises" basically were the power poles. Cornelius has not asserted that such poles were in any way defective or unsafe, or that they contributed to his injuries. PRECorp did require Baldwin to perform the work in compliance with applicable safety laws, but that does not lead to the conclusion that PRECorp was in charge of safety measures. Indeed, it implies the contrary. PRECorp did meet with Baldwin just prior to his termination in an effort to get him to comply with safety regulations, but that is not an indication that ensuring the safety of Baldwin's employees was PRECorp's duty under the contracts. Rather, PRECorp's duty was to provide safe premises, which it did.

[¶ 16] The fundamental flaw with Cornelius's argument is that it directly contravenes the basic premise that an employer of an independent contractor is not liable for injuries suffered by that independent contractor's employee. Stated succinctly, Cornelius argues that PRECorp should be liable for his injuries because PRECorp did not fulfill its duty to make sure that Baldwin provided equipment that was properly tested. The problem, of course, is that that is the legal duty that PRECorp specifically did not have under independent contractor law.

[¶ 17] In addition to the principles of law set forth in the district court's decision letter and quoted hereinabove, we would add the following. In particular,

"The owner may retain a broad general power of supervision and control as to the results of the work so as to insure satisfactory performance of the independent contract—including the right to inspect, the right to stop the work, the right to make suggestions or recommendations as to details of the work, the right to prescribe alterations or deviations in the work— without changing the relationship from that of owner and independent contractor or the duties arising from that relationship."

*Franks v. Indep. Prod. Co.*, 2004 WY 97, ¶ 10, 96 P.3d 484, 490 (Wyo.2004) (quoting *Noonan v. Texaco, Inc.*, 713 P.2d 160, 165 (Wyo.1986)). That very principle was exemplified by the meeting PRECorp arranged with Baldwin to address deficiencies in his performance. Furthermore, the standard form contract being used by the parties— RUS Form 792—has been found not to give

an owner acting thereunder such a right to control the details of the work as to make it liable for injuries to an independent contractor's employee. *Victoria Elec. Coop. v. Williams,* 100 S.W.3d 323, 329 (Tex.App. 2002). And finally, a bald assertion such as Baldwin's deposition statement that PRE-Corp "had an absolute right to do whatever they want with [their property]," does not create a genuine issue of material fact in the face of contract language directly to the contrary. *Cockburn v. Terra Res., Inc.,* 794 P.2d 1334, 1340–41 (Wyo.1990).

### *Whether genuine issues of material fact exist as to whether Baldwin was an independent contractor?*

 [¶ 18] This issue largely has been answered in the negative in the discussion of the second issue. Having reviewed the entire record, and in particular having read all the depositions in the file, we are convinced that there is not a genuine issue of material fact as to whether Baldwin was an independent contractor. Attorney's questions, including leading questions in a deposition, are not evidence. Cornelius's counsel tried valiantly throughout Howard Baldwin's deposition to get him to say that PRECorp could control Baldwin's work. Despite some responses such as the one mentioned above suggesting PRECorp had the "right to do anything they wanted," Baldwin's essential testimony was that PRECorp "never told us how to do it. They expected us to know how to do it." The gist of the relationship between Baldwin and PRECorp was described in this exchange between counsel and Baldwin:

Q. Okay. I take it that the written document that you had regarding the maintenance work was just a list of—

A. Price maybe, yeah.

Q. And I also understand it, there wasn't any description on that list of exactly how PRECorp wanted this work done; is that fair?

A. No, but you have—you have—you have industry standard.

Q. Okay.

A. Kind of an unwritten rule, you know. *We have industry standards, and you agree to do this work for them, it's just* *generally understood that it's going to be up to those industry standards.*

(Emphasis added.) We believe this succinctly describes the contractual relationship between PRECorp and Baldwin. Baldwin gave PRECorp a price list or fee schedule for particular maintenance tasks, agreeing to perform those tasks to industry standards. PRECorp retained the right to object if the work did not meet those standards, and to require Baldwin to correct any deficiencies. This relationship was the epitome of an independent contractor relationship.

### *Whether genuine issues of material fact exist as to PRECorp's liability for its own negligence?*

 [¶ 19] Cornelius alleges that, in addition to being vicariously liable for Baldwin's negligence, PRECorp is also directly liable for its own negligence. Cornelius's argument may be summarized as follows:

1. The owner's duty to an employee of a contractor working on the premises is the duty to exercise reasonable care under all the circumstances to protect that employee from foreseeable dangers. *Franks,* 2004 WY 97, ¶ 16, 96 P.3d at 492.

2. Ultrahazardous activities create a nondelegable duty on the part of the owner to maintain a safe workplace. *Id.*

3. Any duty voluntarily assumed by PRECorp must be performed with reasonable care, even if no duty otherwise existed. *Valance v. VI–Doug., Inc.,* 2002 WY 113, ¶ 15, 50 P.3d 697, 703 (Wyo.2002).

4. PRECorp trained its own crews, and inspected its own equipment, but did not do the same for Baldwin's crews and equipment, even though it retained control over Baldwin's work.

5. PRECorp was negligent in not shutting Baldwin's work down immediately upon learning of Baldwin's deficiencies, rather than merely calling the meeting of February 21, 2002.

[¶ 20] The district court's decision letter paid more detailed attention to the allegation of vicarious liability than it did to the allegation of direct liability. Nevertheless, it did identify the above legal principles before reaching the following conclusion:

The court acknowledges that working with electricity is an ultrahazardous endeavor. Therefore, PRECorp owes a greater duty of care than simply what would be reasonable under all the circumstances, the oft-cited basic standard of care for premises liability in Wyoming. Here, however, there was nothing inherently faulty with the PRECorp power line. Instead, it was a deficiency (or multiple deficiencies) in the equipment provided to [Cornelius] by [Baldwin] and/or failure on the part of [Cornelius] himself that led to [Cornelius's] injuries.

[¶ 21] PRECorp had no affirmative duty toward Cornelius that it breached. There is no allegation that PRECorp's "premises" were unsafe. PRECorp did not control the method and manner of work performed by Baldwin, and PRECorp did not voluntarily assume any safety duties. Cornelius's injuries were caused by his own lack of care, and/or by Baldwin's failure to provide safe equipment.

## CONCLUSION

[¶ 22] There are no genuine issues of material fact to contradict the conclusion that PRECorp was not vicariously liable for the acts of its independent contractor, Baldwin, and that PRECorp violated no separate legal duty owed by it to Cornelius.

[¶ 23] Affirmed.